# Green & Willstatter
ATTORNEYS AT LAW
200 MAMARONECK AVENUE
SUITE 605
WHITE PLAINS, NEW YORK 10601

THEODORE S. GREEN
RICHARD D. WILLSTATTER

(914) 948-5656
FAX (914) 948-8730

E-MAIL: THEOSGREEN@MSN.COM

June 2, 2011

HON. COLLEEN McMAHON
United States District Court
500 Pearl Street
New York, New York   10007

> re: *United States v. Cromitie, et al. (David Williams)*
>      09 Cr 558 (CM)

Dear Judge McMahon:

This letter is submitted as a presentence memorandum on behalf of defendant David Williams, who is scheduled to be sentenced on June 16, 2011.

We respectfully submit that a sentence of 25 years' imprisonment (300 months), which is the statutory mandatory minimum sentence, is "sufficient, but not greater than necessary to comply with the purposes set forth" in 18 U.S.C. §3553(a)(2), and we urge the Court to impose such a sentence, together with 5 years' supervised release and a special assessment of $100 for each of the eight counts of conviction.

Objections to PSR

We address in the following portion of this memorandum our various objections to the presentence report prepared by the Probation Department and its guideline calculations:

Description of Offense Conduct

The defense objects to the description of the offense conduct at paragraphs 20 through 42 of the PSR on the ground that it omits the following facts established by the trial record which we request be incorporated into the report:

The confidential informant ("CI") presented himself as a wealthy Pakistani businessman knowledgeable about Islamic teachings. The CI was, in fact, a wealthy Pakistani businessman with an MBA and years of training in Islamic studies. From the beginning, the CI told Cromitie that he (the CI) had a plan and that Cromitie would make money out of it, but that Cromitie should not "do it just for the money," but also "in the name of Allah."

On October 12, 2008, it was the CI, not Cromitie, who brought up the subject of "things happening" in Pakistan, and informed Cromitie that "mushriks" (non-believers in Islam) were killing Muslims there. When Cromitie asked what the CI was talking about, the CI told Cromitie that the teachings of the Prophet Mohammed permitted or even required Muslims to commit violence against non-believers. The CI explained that, as a Muslim, Cromitie needed to "do something in jihad" to retaliate against the non-believers. The CI also denounced Jews and other non-believers as "evil" and urged that "you, me, all these brothers, have to come up with a solution to take the evil down. That's how, it's the hadith."

At their next meeting, on October 19, 2008, the CI told Cromitie that, according to the Prophet Mohammed, the Jews "are responsible for all the evils in the world" and that they should be eliminated. Cromitie responded that "they aren't responsible for that. I don't wanna go that far with him." The CI repeatedly urged Cromitie to do "something" for the cause of Allah, and offered to spend money help Cromitie do such a thing. On October 29, 2008, the CI demanded of Cromitie: "Brother, tell me, I want to know. If Allah . . . asked for, for you to go, to go to the jihad, would you say Allahu akbar?" Cromitie was evasive, and said maybe he would and maybe he wouldn't.

At their next several meetings, the CI pressed Cromitie to introduce him to some of Cromitie's supposedly like-minded "brothers," which Cromitie never did. The CI said there could be "no peace" until the mushriks left the Holy Land. The CI repeatedly raised the subject of jihad, and repeatedly urged Cromitie to join him in committing violence for the cause of Islam. The CI also said he could supply all the missiles, guns, and rockets they would need.

From late October through December 2008, The CI repeatedly and explicitly urged Cromitie to make a plan, pick a target, find recruits, get guns, and conduct surveillance. Although he made a number of hateful remarks, and suggested he might be interested in engaging in some jihadist act, Cromitie never produced any recruits or came up with any concrete ideas or plans for any terrorist plot. On December 10, the CI reminded Cromitie that he had done none of the things he was supposed to do. CI: "[Y]ou've not started the first step brother. Come on." Cromitie: "Maybe it's not my mission then. Maybe my mission hasn't come yet."

By December 2008, the CI began explicitly referring to these potential recruits as "bodies." The CI repeatedly told Cromitie how he should go about recruiting. He told Cromitie how many persons were needed, and urged Cromitie to talk to people at the Newburgh mosque or to reach out to "the whole town" to find recruits. He also proposed, as potential recruits, the names of particular persons who attended the Newburgh mosque or with whom Cromitie was acquainted.

The CI combined this with what would become increasingly large and explicit offers of financial and material rewards, including promising (in December 2008) to give his BMW to Cromitie – but only after the operation was completed – and later offering to buy Cromitie a barbershop for $60-70,000. By February 23, 2009, the CI was explicitly promising that Cromitie and anyone recruited for an operation would be rewarded in "two ways," meaning they would eventually "go to paradise" but, while on Earth, would receive substantial cash rewards. The CI, more than

2

once, told Cromitie he would make him "the happiest man on planet Earth."

At some point (although it is not on tape), the CI offered to pay Cromitie a $250,000 cash reward if he would agree to participate in the plot. On April 5, 2009 (on tape), the CI reminded Cromitie of the earlier $250,000 offer. At trial, the CI admitted that on several occasions he had "suggested" to Cromitie that he would "get a lot of money" for participating in the plot.

The CI implored Cromitie to accompany him on a surveillance trip around Stewart Airport on February 24, 2009, during which he first told Cromitie of the need for "lookouts" or "lookout guys," a role that the CI admittedly conceived. That day, the CI repeatedly referred to the cash he was willing to pay such "lookouts." Also, the CI bought Cromitie a digital camera with which Cromitie was supposed to take surveillance photographs at the airport. At the end of the day, they agreed to meet the next day, February 25.

On February 25, Cromitie failed to show up for the planned meeting. Then, for the next six weeks, Cromitie dropped completely out of sight, telling the CI, falsely, that he had gone to North Carolina for work. He avoided the CI's calls and even hid in his house when the CI came looking for him.

During that six week period, Cromitie was fired from his low wage job at the Newburgh Wal-Mart, and tried unsuccessfully to get his job back. In March 2009, Cromitie sold the digital camera the CI had bought for him on February 24 to a neighbor for $50 or $60.

On April 5, 2009, Cromitie called the CI to say he was broke and needed to make some money. The CI's response: "I told you, I can make you $250,000, but you don't want it brother. What can I tell you?" The CI's offer got Cromitie's attention; they agreed to meet two days later.

On April 7, the CI repeatedly told Cromitie of the need for "lookout guys," while making clear that the "lookouts" would be paid, after Cromitie told the CI (as he had repeatedly told the CI before), that he had not found any recruits for an operation. The CI complained that Cromitie's foot-dragging had put the CI's life at risk. The CI also promised an all-expense paid two-week vacation to Puerto Rico for Cromitie and his family, but only after the operation was complete.

After meeting David Williams on April 10, 2009, the CI met with Cromitie on April 16 and promised to give Williams "separate money" (i.e., separate from the reward money intended for Cromitie) if Williams agreed to participate. At that time, Cromitie had been telling the CI David Williams was not part of the operation and that Cromitie could not say whether he would be.

Also on April 16, the CI reiterated the offer of an all expense paid vacation to some place warm and sunny, and promised Cromitie enough cash to do "whatever you want to do" and to "buy a brand new car" (presumably in addition to the previously-promised BMW). He also promised to buy Cromitie (whose only skill is barbering) a barbershop for $60-70,000. As Cromitie and the other defendants did on many occasions, Cromitie pretended he wasn't in it for the money, but ultimately

3

made the following observation: "Oh, they pay us to do this. . . . [G]ive the brother something [for] doing that mission."

Throughout April and May 2009, the CI gave small amounts of money to Cromitie and the other three defendants, to pay for rent, groceries, meals, cell phone cards, and car fare, and held out the promise of far greater cash rewards after the mission was complete. The CI also pretended to be in contact with a lawyer who could arrange to postpone a court appearance that Williams was required to make in Queens County to pay a $1000 fine on a misdemeanor conviction.

On May 1, 2009, the CI told Cromitie he had "very good news"; he was "going to Florida to pick up the money." Cromitie delightedly passed the news on to his co-defendants. In the same conversation, the CI reminded Cromitie of his earlier promise to give Cromitie the BMW. On May 8, Cromitie complained to Onta Williams that the CI had not given them enough of the promised reward, and that he was going to tell the CI that they weren't going to do anything until they "got paid" what they were "supposed to get." Later that day, Cromitie did complain to the CI, and the CI reassured him that he and the others would "be rewarded for the things they do."

The CI admitted at trial that he promised cash rewards to each of the defendants. He claimed the money reward was limited to $5,000 for each defendant, but did not record the only conversation in which he claimed to have told the defendants about this amount. On May 20, 2009, while driving the four defendants to the Riverdale section of the Bronx where they were arrested, the CI provided keys to each of the defendants, which he claimed would open UPS mailboxes where the defendants could pick up their money after the operation.

The CI and his government handlers devised all the plans, identified all the targets, picked all the operative dates, and supplied all the transportation, maps, cameras, "weapons," meeting places, storage facilities, food and beverages, and money for the operation. Every logistical detail of the plot was orchestrated, financed, and facilitated by the CI and the FBI. The defendants did not take a single step to further the CI's plot when they were not with the CI. As the case agent admitted at trial, the government was "pretty much in control of what the defendants were doing."

Also, there was no evidence adduced at trial that any of the defendants had any prior connections to terrorists or terrorist organizations or had a history of prior activities similar to the offenses involved in this case. There was also no evidence adduced that any of the defendants possessed the necessary resources, skills, or equipment that would have enabled them to carry out the plot absent the direction of the government. Without what the government has conceded was a "sting operation [that] was, by law enforcement standards, relatively elaborate," no crime would or could have occurred.

### Grouping Objection - USSG §3D1.2

At paragraphs 47 through 89 of the report, the PSR incorrectly concludes that the eight counts of conviction should be grouped into three separate groups. USSG § 3D1.2 provides that "[a]ll

4

counts involving substantially the same harm shall be grouped together into a single Group," such as "[w]hen counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." Id. § 3D1.2(b). As set forth in Application Note 2, in cases where there is no identifiable victim, the "victim" is deemed to be "the societal interest that is harmed," and "the counts are grouped together when the societal interests that are harmed are closely related." Here, the counts relating to the attempted bombings in the Bronx and the counts relating to the attempted missile firings in Newburgh were all "part of a common scheme or plan." Moreover, as set forth in the PSR (paragraph 43) there are no identifiable victims in this case. All eight counts of conviction involve a "closely related" societal interest – that is, the societal interest protected by laws against using bombs and missiles against targets in the United States. Accordingly, all of the counts of conviction should be grouped together as closely related, and not separated into different groups. Therefore, the 3 level multiple-count grouping adjustment set forth at paragraphs 79-84 should not apply.

### Objection to 3A1.1 Enhancement - Hate-Crime Motivation

The defense objects to paragraphs 55 and 62, which add a three level enhancement under USSG 3A1.1. In the case of a defendant, like Williams, who proceeds to trial, this enhancement is only permitted if the finder of fact at trial "determines beyond a reasonable doubt that the defendant intentionally selected any victim or any property as the object of the offense of conviction, because of" impermissible factors such as "religion." In the present case, no such determination was made by the trier of fact, as the question was never submitted to or considered by the jury.

### Objection to 3A1.2 Enhancement - Official Victim

The defense objects to paragraphs 68, 69 and 70 in that it adds a 6-point enhancement in paragraph 67 and three point enhancements in paragraphs 69 and 70, under USSG §3A1.2(a). The commentary to 3A1.2, at application note 1, provides that "This guideline applies when specified individuals are victims of the offense. This guideline does not apply when the only victim is an organization, agency, or the government." There are no specified individual victims in this case and PSR, at paragraph 43, notes that there is "not identifiable victim" in this case.

### Objection to 3A1.4 Terrorism Enhancement

At paragraphs 56, 63, 68, 69, 70 and 75 of the PSR, the defense objects to the 12 level terrorism enhancement as well as the automatic upward departure to Criminal History Category VI that results from the terrorism enhancement. USSG § 3A1.4(a), (b). The enhancement applies if "the offense is a felony that involved, or was intended to promote, a federal crime of terrorism." To qualify as a "federal crime of terrorism" that may serve as a predicate for the terrorism enhancement, the crime must be "an offense that . . . is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," 18 U.S.C. § 2332b(g)(5)(A), and it must also be listed in 18 U.S.C. § 2332b(g)(5)(B). The offenses of conviction here are all listed in subparagraph (B) of the statute.

To satisfy the "calculation" requirement of 18 U.S.C. § 2332b(g)(5)(A), the defendant

5

himself must have had the specific intent "to influence or affect the conduct of government." <u>United States v. Stewart</u>, 590 F.3d 93, 138 (2d Cir. 2009), *cert. denied* 130 S.Ct. 1924 (2010). In this case, the jury made no such findings. Whether Williams "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" was not an element of any of the offenses charged. Therefore, the fact that he was found guilty of these offenses does not mean the jury necessarily made these findings.

Moreover, there was no credible evidence adduced at trial that Williams had the specific intent "to influence or affect the conduct of government." Talk of financial reward pervaded the evidence at trial, not talk of influencing or affecting the conduct of government. Williams was recruited in the role of a lookout, after the CI told Cromitie that additional people were needed for the operation and the CI offered financial rewards to anyone who would participate in the operation as an inducement. The evidence fails to establish by the requisite standard of proof that Williams' had the specific intent required for the enhancement.

<u>Objection to 2M6.1 Base Offense Level</u>
The defense also objects to the 42 base offense level under USSG §2M6.1(a)(1) at paragraphs 53, 60 and 72. The enhancement applies if the offense was committed "with intent (A) to injure the United States; or (B) to aid a foreign nation or a foreign terrorist organization." With respect to paragraphs 52 and 59, the offense was against private property, not against the United States, and, with respect to paragraphs 52, 59 and 68, the evidence does not establish by the requisite standard of proof that Williams acted with that specific intent to aid a foreign nation or a foreign terrorist organization or to injure the United States. Williams was recruited in the limited role of a lookout, after the CI told Cromitie that additional people were needed for the operation. The CI offered financial rewards to anyone who would participate in the operation as an inducement.

If the base offense level under this guideline is not 42, it would be 28 under USSG § 2M6.1(a)(2).

Moreover, it would be "double counting" to establish a base offense level of 42 under this guideline, while at the same time imposing the 12 level terrorism enhancement under USSG § 3A1.4. The base offense level under USSG § 2M6.1 is 28 unless the offense was committed with the requisite intent to injure the United States or aid a foreign nation or terrorist organization, in which case the base offense level is 42. The terrorism enhancement is imposed when the offense of conviction involved a federal crime of terrorism, meaning an offense "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," 18 U.S.C. § 2332b(g)(5)(A). Thus, if USSG § 2M6.1(a)(1) applies (base offense level 42), the 12 level terrorism enhancement should not apply because Section 2M6.1(a)(1) already takes such conduct into account. "Impermissible double counting occurs when one part of the guidelines is applied to increase a defendant's sentence to reflect the kind of harm that has already been fully accounted for by another part of the guidelines." *United States v. Napoli*, 179 F.3d 1, 12 n.9 (2d Cir 1999) (internal quotation marks omitted), *cert. denied*, 528 U.S. 1162 (2000), *accord United States v. Volpe*, 224 F.3d 72, 76 (2d Cir. 2000); *United States v. Sabhnani*, 599 F.3d 215, 251 (2d. Cir.

2010), *cert. denied* 131 S.Ct. 1000 (2011).

The final offense level as calculated under this guideline should be no more than 28 under subsection (a)(2). If the 12 level terrorism enhancement applies, the final offense level would be 40. If the court determines that the base offense level is 42 under subsection (a)(1), then the 12 level terrorism enhancement would not apply because of double counting, and the final offense level would be 42.

### Objection to Base Offense Level 26 and 15 Level Enhancement under USSG § 2K2.1

At paragraphs 70 through 72 of the PSR, the defense objects to using base offense level 18 under USSG § 2K2.1(a)(1), and also objects to the 15 level enhancement under USSG § 2K1.2(b)(3). The PSR states that the base offense level is 18 because the offense involved a firearm described in 26 U.S.C. § 5845(a). The PSR does not identify which subsection of Section 5845(a) applies. Presumably, the PSR is referring to a "destructive device," 26 U.S.C. § 5845(a)(8). Since the "missiles" provided to the defendants by the confidential informant were inert and were not capable of being fired, the only arguably pertinent portion of the definition of a "destructive device" that might apply is "any type of weapon by whatever name known which . . . may be readily converted to expel a projectile by the action of an explosive or other propellant." 26 U.S.C. § 5845(f)(2). But the inert missiles in this case certainly could not have been "readily" converted to expel a projectile. Thus, the offense did not involve a firearm described in 26 U.S.C. § 5845(a). USSG § 2K2.1(a)(1).

The defense also objects to the 15 level enhancement under USSG § 2K2.1(b)(3), which applies to an offense involving a "destructive device that is a portable rocket, a missile, or a device for use in launching a portable rocket or a missile." Since the guideline gives the term "destructive device" the "meaning given that term in 26 U.S.C. § 5845(a)," Application Note 1, and since, as noted above, the inert missiles in this case could not have been "readily" converted to expel a projectile, this enhancement does not apply.

In short, the maximum offense level under USSG § 2K2.1 is 16 or 18 (Base offense level 12 or 14 under subsection (a)(2), plus 4 levels under subsection (b)(6) because the defendant possessed a firearm in connection with another felony offense.) Williams does not qualify for a further enhancement in that he does not have prior felony convictions for either a "crime of violence" or a "controlled substance" as defined in USSG §4B1.2.

### Open Warrant

Paragraph 111 of the PSR should include a statement that the warrant was issued because Williams was unable to appear due to his being in Federal detention on the instant case.

### Miscellaneous

Paragraph 26 of the presentence report states that on April 10, 2009, "they photographed two potential targets." The trial evidence was that Cromitie took photographs that day but not David Williams. At the end of the day, the CI asked Cromitie whether Williams was "part of the operation"

and Cromitie responded "No". (Trial tr. at 878).

Paragraph 136, referring to one of Williams' tattoos, translates the phrase "Allah Akbar" as meaning "God is great", but goes on to add that this "is widely known a Muslim war cry" [sic]. The defense seeks to have the words "and is widely known a Muslim war cry" stricken. "Allah Akbar" is a common Islamic phrase, one used by Muslims during daily prayers, and Williams' tattoo is not meant as a war cry.

Final Offense Level

The final offense level should be 33, pursuant to USSG § 2A2.1. (PSR paragraph 68).

Criminal History Category

Williams' criminal history category is no greater than Category V (PSR paragraph 119).

Sentencing Range

Based on a total offense level of 33, and a Criminal History Category of V, the sentencing guideline range is 210-262 months. However, because the mandatory minimum term of imprisonment for Counts Five and Six is 25 years (PSR ¶ 157), the sentencing range is 300 months.

If the court determines that the final offense level is 42 under USSG § 2M6.1(a)(1) (with no terrorism enhancement), at Criminal History Category V, the sentencing range would be 360 months to life.

If the court determines that the final offense level is 40 under USSG § 2M6.1(a)(2) and USSG § 3A1.4 (terrorism enhancement), at Criminal History Category VI, the sentencing range would be 360 months to life.

Downward Departure

This case is outside the "heartland . . . of typical cases embodying the conduct that each guideline describes", USSG Chapter 1, Introductory Commentary 4(b), and presents "the exceptional case in which there is present a circumstance that the Commission has not identified in the guidelines but that nevertheless is relevant to determining the appropriate sentence." USSG §5k2.0(a)(2)(B). There exists a mitigating circumstance "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Guidelines Commission in formulating the guidelines that should result in a sentence" below the guideline range. 18 U.S.C. §3553(b)(1). "When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted." USSG Chapter 1, Introductory Commentary 4(b).

The probation department recommends a below-guidelines sentence (PSR at 41-42), writing

that "[b]ecause the instant offense did not result in loss of life, accounting for the role of the CI, and when compared to sentences imposed in other terrorism offenses, we believe that the sentencing objectives can be satisfied by a sentence of 35 years' incarceration." The probation department does not call this recommendation a departure, but argues it to be in line with the sentencing purposes set forth in 18 U.S.C. 3553(a)(2). PSR at 41.

This is an exceptional case, one which the Court has described as *sui generis*. (3/24/11 Tr. 34). As this Court wrote: "It is beyond question that the Government created the crime here." Decision and Order Denying Defendants' Post Trial Motions, May 10, 2011 at 44. The CI used outrageously high money offers, offers of other material rewards and other forms of pressure to induce Cromitie and, in turn, used Cromitie as a recruitment tool. It was evident at least as far back as December 2008 that the CI was not content to induce Cromitie alone but wanted to cobble together a conspiracy where none existed – a collection of what the CI called "bodies." To that end, he made clear to Cromitie that anyone he recruited for an operation would receive financial rewards as well. After Cromitie protested that he did not want to recruit people from the Newburgh mosque, the CI urged Cromitie to reach out to "the whole town" to find recruits. In an effort to find a justification for this recruitment drive, the CI, not Cromitie, conceived of the role of "lookout guys."

The FBI controlled the operation from beginning to end. It supplied the transportation, the meeting place, the storage facility, the warehouse, the cameras, the maps, the "weapons" and even the food and beverages that made all of this possible.[1]

Our Circuit has recognized that "there might be cases whose circumstances would warrant a downward departure on the basis of imperfect entrapment" – i.e., government conduct "that does not give rise to an entrapment defense but that is nevertheless 'aggressive encouragement of

---

[1] In providing the materials and logistics, the government was well aware of the sentencing consequences, even during the time period when Cromitie was avoiding the CI and well before any "recruits" first met the CI. For example, one government memorandum (3501-313) (the authorship is unknown to us due to redactions), describes the "situation" as of March 13, 2009 and includes this statement:
> EU [Explosives Unit] coordinating with ERF regarding potential introduction of Stinger Missiles for potential operation. AUSA advised that the use of a guided missile system in a terrorist operation is a minimum 25 year sentence.

A subsequent memorandum (3501-314) describes the "situation" as of March 25, 2009, and includes:
> on 03/16/09 a conference call was made between ERF and EU to coordinate the alterations of two Stinger Missiles for potential operation. AUSA advised that the use of a guided missile system in a terrorist operation is a minimum 25 year sentence.

wrongdoing.'" *United States v. Bala*, 236 F.3d 87, 92 (2d Cir. 2000), *quoting United Staves v. Garza-Juarez*, 992 F.2d 896, 912 (9th Cir. 1993)).

In this case, for the reasons stated above, there was an "aggressive encouragement of wrongdoing" that would justify a downward departure.

The Court should downwardly depart to the mandatory minimum of 25 years, regardless of what guideline range it finds applicable.

Section 3553(a) Factors

Under 18 U.S.C. §3553(a), the Court, after considering the nature and circumstances of the offense and the history and characteristics of the defendant, "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in" 3553(a)(2), which include the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. While the Court must consider the guideline sentencing range, it must make "an individualized assessment" as to the appropriate sentence in light of the 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 50 (2007); *United States v. Booker*, 543 U.S. 220 (2005).

The probation department is recommending a non-guideline sentence of 35 years. We respectfully submit that, after taking into account the nature of the offense and the history and characteristics of the defendant, a sentence of 25 years would be more than sufficient (and certainly not less than necessary) to comply with the purposes of 3553(a)(2).

The nature and circumstances of this offense are unusual owing to role of the CI and his government handlers in providing the means for the offense and in the CI's resort to offers of material reward to create a crime where none existed. That implicates not only the departure grounds that we discuss in the previous section, but also the 3553(a) factors of specific and general deterrence and the need to promote respect for the law. The need to deter Williams specifically, and the public in general, is surely different in this case than it would be in a case involving the investigation of an existing conspiracy that came into being without the inducement and material aid of a CI backed by government handlers. And, the 25-year minimum more than satisfies the purposes of deterrence and promoting respect for the law.

David Williams' criminal history included nothing remotely similar to a terrorist offense. His second (and last) prior felony conviction arose from an offense in 2003 (when he was 22 years old) and his subsequent prior convictions were misdemeanors.

In the early part of 2009, Williams was working as a line-cook in a Brooklyn restaurant. In mid-March 2009, his younger brother became seriously ill and began what would become a prolonged hospitalization that lasted until early May 2009. Mr. Williams is very close to and

10

protective of his younger brother and, by all reports, was emotionally devastated by these events. It was in response to his brother's illness (and not out of a desire to participate in a terrorist operation) that Williams, shortly after his brother's hospitalization, left the restaurant job in March 2009 and began residing with his mother in Newburgh, where he began looking for other employment with local businesses (for example, on April 9, 2009, just one day before he first met the CI, Williams applied for work at a Hannaford's supermarket in New Windsor.).[2]

Taking into account all of the 3553(a) factors, we respectfully urge the Court to impose a sentence of 300 months' imprisonment, a term of 5 years' supervised release and special assessments totaling $800.

Recommendation to Bureau of Prisons

We request that the Court recommend to the Bureau of Prisons that Mr. Williams be housed at a facility as close as possible to the New York metropolitan area, where his family members reside. We also urge that the Court recommend to the Bureau of Prisons that Mr. Williams not be housed in a maximum security facility, particularly one reserved for terrorists and those offenders who commit the most heinous crimes. Despite his conviction in this case, Mr. Williams is not a terrorist.

Very truly yours,

THEODORE S. GREEN

To: All counsel (by e-mail)

---

[2] Attached as Exhibit A are letters of support from a relative and a family friend of Mr. Williams. Other persons close to Mr. Williams spoke in support of Mr. Williams to the probation department and we refer the Court to the probation report. Attached as Exhibit B is one letter from a packet of dozens of similarly-worded letters that were provided by Mr. Williams' aunt, Alicia McWilliams. While we do not contend these represent a scientific opinion poll, they reflect a degree of skepticism about the case not usually seen in a typical government "sting" operation.