UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

UNITED STATES OF AMERICA,

    -against-                                              09 Cr. 558 (CM)

JAMES CROMITIE, et al.,

    Defendants.

------------------------------------------------------------x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/29/11

## DECISION ON SENTENCING ENTRAPMENT/MANIPULATION

McMahon, J.:

    The defendants seek a downward departure for "sentencing manipulation" or "sentencing entrapment." Those are two separate concepts, and I will discuss them separately.

    Sentencing entrapment "normally requires that a defendant convince the fact-finder that government agents induced her to commit an offense that she was not otherwise predisposed to commit." United States v. Knecht, 55 F.3d 54, 57 (2d Cir. 1995) (internal quotation marks omitted). See also United States v. Oliveras, 2010 WL 46872, at *3 & n.5 (2d Cir. Jan. 8, 2010) (summary order). The status of sentencing entrapment claims in the Second Circuit is "unclear," United States v. Caban, 173 F.3d at 93 n.1. Accord United States v. Bala, 236 F.3d 87, 93 (2d Cir. 2000); see also, e.g., United States v. Oliveras, 2010 WL 46872, at *3; United States v. Lian, 2010 WL 3467225, at *2 (2d Cir. Sept. 7, 2010) (summary order); United States v. Floyd, 2010 WL 1718725, at *1 (2d Cir. Apr. 29, 2010) (summary order). What is clear is that if the doctrine has any viability it is extremely limited. "The validity of the concept of 'sentencing entrapment' has not been determined in this Circuit but . . . even where it has been approved in theory, its potential application has been limited to outrageous official conduct which overcomes the defendant's will." United States v. Gomez, 103 F.3d 249, 256 (2d Cir. 1997) (internal quotation marks omitted).

    The record affords no basis for concluding that the Government overcame any defendant's will in this matter, so I reject any effort to find sentencing entrapment in this case.

    "Sentencing manipulation has been described as occurring when the Government engages in improper conduct that has the effect of increasing the defendant's sentence." United States v. Caban, 173 F.3d 89, 93 n.1 (2d Cir. 1999). Sometimes referred to as "sentencing factor manipulation," it asks a court to consider whether "the manipulation inherent in a sting operation, even if insufficiently oppressive to support an entrapment defense,.…or a due process

claim,....must sometimes be filtered out of the sentencing calculus." United States v. Connell, 960 F. 2d 191, 194 (1st Cir. 1992); *quoted in* United States v. Sanchez, 138 F. 3d 1410 (11th Cir. 1998).

The Second Circuit "has not yet recognized the doctrine of sentencing manipulation," United States v. Gagliardi, 506 F.3d 140, 148 (2d Cir. 2007); and while it has made no definitive ruling on the subject, the Court of Appeals has suggested that a viable sentencing manipulation claim "'would likely require a showing of 'outrageous' government conduct'" (Gagliardi, *supra.*, 506 F. 3d at 148, quoting Bala, 236 F.3d at 93. The First Circuit, in United States v. Montoya, 62 F.3d 1, 4 (1st Cir. 1995), did recognize such a doctrine, and even opined that a court would be justified in ignoring a mandatory minimum sentence if it found that the government improperly enlarged the scope or the scale of a crime. However, the same court opined that "garden variety manipulation claims are largely a waste of time" because defendants must meet the high standard of showing "extraordinary misconduct" by the government, which occurs only in the "extreme and unusual case."

The issue of sentencing manipulation comes up in this case in the context of the mandatory minimum sentence that the court is required to impose for defendants' conviction on Counts 5 and 6 – the counts relating to the planned attack on Stewart Air Force Base. These counts carry a mandatory minimum sentence of 25 years imprisonment; the mandatory minimum is triggered solely because of the use of what the defendants thought was a Stinger missile. Defendants argue that the Government devised the plot to fire a Stinger missile toward Stewart AFB – and even went so far as to create an inert Stinger – for the sole purpose of making sure that, in the event of a conviction, the court could not sentence the defendants to less than 25 years.

Considering only the evidence that is presently available to me, I would conclude that this is exactly what happened.

In its earliest days, the sting operation directed toward Cromitie appealed blatantly to his anti-Semitism, and the first criminal activity that the CI discussed with Cromitie was directed toward Jews. There was no discussion of missiles in the opening months of the dance between Hussain and Cromitie; there was no mention of missiles when the FBI opened its formal investigation in September 2008. Had the Government simply planned the Riverdale portion of the "mission," the Advisory Guidelines would still have authorized a life sentence for each participating defendant. To assure myself of this, I asked Probation to calculate the Advisory Guidelines backing out all mention of the Stewart Airport aspect of the case. The total offense level, applying all the enhancements found by the court, is still 43; the terrorism aspect of the case automatically sets the defendants' criminal history at Level VI. So the ultimate Guidelines calculation and Guidelines sentencing recommendation would have been the same whether or not the attack on Stewart was ever planned, let alone carried out.

However, the other six counts do not carry a mandatory minimum, and because of the advisory nature of the Guidelines, the court would have had discretion to depart downwardly, or even to sentence at variance with the Guidelines, based on certain well-defined statutory factors.

The Government (not Cromitie) first introduced the idea of an attack on Stewart to the "mission" several months after the CI proposed attacking Jewish targets. Although Cromitie lived in Newburgh he had never been to Stewart; the CI told Cromitie that supply planes for U.S. troops in Afghanistan were flying out of the airport. It is clear from the December 17, 2008 conversation between the CI and Cromitie that it was not Cromitie's idea to shoot a missile at military aircraft at Stewart Airport:

> Cromitie:   Stewart Airport?
>
> CI:         It's up to you.
>
> Cromitie:   Is that what you . . .
>
> CI:         No. It's up to you.
>
> Cromitie:   *But that's the place you told me.*
>
> CI:         *Yeah, Yeah, I told you* because airports are, are close by, you know? A military target would be fine. You think a military target is nice, you know? It's nice.
>
> Cromitie:   I like that . . .yeah but them some big planes. I think we can do that.

(GX 113-E1-T) (emphasis added). Only then, believing they had Cromitie on the hook, did Agent Fuller begin the process of acquiring the props needed for the planned sting. In a December 23, report to his superiors, Fuller's investigative plan includes the following: "Prepare Tier 1 OIA communication in order to utilize inert explosives and *or military weaponry* to show CROMITIE based on targets identified." (3501-287) (Emphasis added). The targets had of course been identified in the first instance by the Government. So it is beyond cavil that the idea for the missile was the Government's – it certainly was not Cromitie's. Indeed, I very much doubt that James Cromitie had any idea what a Stinger missile was.

Such evidence as is in the record suggests that the United States Attorney's Office was aware of this plan; in the same December 23 report, Fuller states that the F.B.I. will "continue to provide updated briefs to SDNY AUSA Snyder." Id.

Of course, the missile was never intended to be anything more than a prop. The Government never intended to let the defendants get anywhere close to Stewart Air Force Base with a missile, or with what they imagined to be a missile. Special Agent Fuller himself assured officials at Stewart that they were in no danger, because Cromitie would not be able to mount a strike against the Air Base without Hussain's help. (3501-188). The Government's operational plan for May 20, 2009, was to arrest the defendants in Riverdale, after the IEDs were planted at the synagogues, surrounded by law enforcement personnel and in full view of an arsenal of

cameras.[1] The Government never planned to have defendants make actual use of the lone item that drives the mandatory minimum-- the Stinger (aptly named, in the circumstances).

The Government analogizes its conduct in introducing the missile to narcotics cases in which agents pressure drug dealers to sell enough cocaine to subject themselves unwittingly to five or ten year mandatory minimum sentences – conduct that has been repeatedly found not to constitute sentencing manipulation. For me, the analogy does not work.

In the "50 grams or more" crack cases (which this court sees several times each week), the defendant has already been identified as a seller of illegal narcotics; he or she is already engaged in criminal activity with suppliers and customers. By seeking to purchase a greater quantity of drugs from someone who has access to drugs and expressed a willingness to sell them, the Government can plausibly argue that it is doing no more than seeing if the individual has access to more illegal narcotics and is willing to procure them. That this drives up the Guidelines and triggers some mandatory minimum is a collateral consequence.

Here, by contrast, the defendants were not engaged in any terrorist activity before they encountered the CI. In fact, they were not engaged in any sort of criminal activity at all. As this court has previously found -- and as the Government has all but conceded -- Agent Fuller did not stumble upon an existing conspiracy and render it effectively inoperative by taking it over. Rather, he (through the ears of his confidential informant) heard chilling expressions of hatred uttered by a bigoted human being, and transformed that man's fantasies – fantasies the defendant, James Cromitie, had no way of bringing into being -- into very real criminal activity, whose every movement was directed and dictated by the Government. There is no way that these four defendants would have dreamed up the idea of shooting a Stinger missile at an airplane or at anything else; there is certainly no way they could have acquired a Stinger missile, operative or inert, unless the Government provided them with one. Nothing in the record suggests that these four men would have had a clue about how to contact an illegal arms trafficker, or that they could have come up with the kind of money it really takes to acquire deadly armaments.

None of this changes the fact that the defendants embraced the idea of firing a missile at government aircraft; it does not vitiate their convictions on Counts 5 and 6. Nor, as I have already opined, does it constitute the sort of "outrageous government misconduct" that violates the defendants' Fourteenth Amendment due process rights. But it would certainly be fair to infer that the purpose for introducing the missile element into the case was to render the defendants subject to the quarter-century mandatory minimum. I can think of no other purpose for doing so.

However, in order to nail that inference down, I would have to hold a hearing to inquire into the communications between various law enforcement officers and the Assistant United States Attorneys who were then working on the case. There is no need to hold such a hearing if the Court, after a finding of sentencing manipulation, would be unable to fashion any meaningful remedy. And that is the position in which I find myself.

---

[1] Even this was gratuitous, since all the elements of the crimes of conviction were complete before the trip to Riverdale began. The TV news coverage, however, would not have been so dramatic.

Defendants ask the Court to take the "bold step" of sentencing the defendants below the statutory minimum. (O. Williams Mem. at 1, joined by both Cromitie and D. Williams). But I believe that I would thereby violate the law.

Notwithstanding the varying approaches that different courts of appeals have taken regarding the scope and applicability of sentencing entrapment and manipulation, no circuit has actually upheld a district court's decision not to impose a mandatory minimum sentence because of manipulation. A decade and a half ago, the First Circuit stated in Montoya (in what had to be dictum) that a sentencing court had the power to sentence below the mandatory minimum in a case where manipulation was established – but then declined to find that manipulation was established. More recently, however, in United States v. Oliveras, 2010 WL 46872, at *3-4, the Second Circuit held squarely that it was manifest error for a district judge to impose a sentence below an applicable mandatory minimum, even if the record warranted a finding that the Government had engaged in "aggressive encouragement of wrongdoing." In United States v. Pena, 2008 WL 4772099, at *3 (2d Cir. Nov. 3, 2008), the Second Circuit concluded that the district court lacked the authority to impose a sentence below the mandatory minimum to redress either sentencing manipulation or sentencing entrapment. Our Court of Appeals has also held, more generally, that, "[M]andatory minimums have taken on increased significance after [United States v. Booker, 543 U.S. 220 (2005)] — in that they remain binding on the district courts and work to restrain their newly acquired discretion. . . ." United States v. Jimenez, 451 F.3d 97, 102 (2d Cir. 2006 ; see also, United States v. Sharpley, 399 F.3d 123, 127 (2d Cir. 2005) ("Booker makes the Guidelines advisory in nature, leaving sentences to the district court's discretion, guided by the Guidelines and the other factors of § 3553(a), and bounded by any applicable statutory minimum and maximum.").

The bottom line is that I do not believe that I have any discretion to sentence the defendants to less than 25 years in this case, even though I think it highly likely that the only reason the Government introduced the missile element into this case was to prohibit me from sentencing the defendants to less time than that. What this means, of course, is that the doctrine of sentencing manipulation (if it exists at all) is effectively a dead letter in cases where there are statutory mandatory minima. I see no way around that conclusion.

This constitutes the decision and order of the court.

Dated: June 29, 2011

_____
U.S.D.J.

BY ECF TO ALL COUNSEL