UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————————— x

UNITED STATES OF AMERICA,

    -against-                             09 Cr. 558 (CM)

JAMES CROMITIE, et al.,

    Defendants.

——————————————————————————— x

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  6/29/11
```

### DECISION ON CHALLENGES TO THE GUIDELINES CALCULATION
### AND OTHER ASPECTS OF THE PRE-SENTENCE REPORTS

McMahon, J.:

    The court issues this written decision to set forth the basis for its calculation of the Advisory Sentencing Guidelines and to address other issues raised by Probation's Pre-Sentence Reports for each of the three defendants being sentenced today (all defendants except Laguerre Payen). The issue of sentencing entrapment/manipulation, and what it means and does not mean for the sentencing, will be addressed in a separate decision.

### Calculation of the Sentencing Guidelines

Description of the Offense Conduct

    Before dealing with the various objections to Probation's calculation of the Advisory Guidelines, it is necessary to deal with the description of the offense conduct, since the court's findings about what happened factor into the sentencing calculations.

    The court strikes the Probation Department's description of the Offense Conduct in each defendant's Pre-Sentence Report (PSR). I direct Probation to substitute therefore my detailed findings of fact concerning the Offense Conduct, which can be found at pages 4 through 14 of my decision denying the motion to dismiss the indictment for outrageous Government misconduct. The Court's prior findings of fact on the same subject – reached after sitting through the trial and conducting an exhaustive post-trial review of the record -- are, in my opinion, complete, accurate, neutral and wholly in keeping with the jury's verdict and my subsequent decision not to set the verdict of no entrapment aside. The Probation Department is directed to incorporate those findings into the PSRs that will ultimately follow the defendants through the system.

Probation's Calculation of the Guidelines

The computation of the defendants' total offense level under the United States Sentencing Guidelines yields a much higher number than the ultimate number (43) that the Probation Department assigns to each of the defendants. Probation calculated the total offense level for Cromitie at 65 and for David Williams[1] and Onta Williams at 60 (Probation also calculated Laguerre Payen's guideline at 60, but as he is not being sentenced today I can make no final determinations about him). Cromitie's total offense level is five points higher than the other three defendants because (1) he was given two extra points for being "an organizer, leader, manager, or supervisor," and (2) his total offense level for Group Three (each of the defendants' total offense level was calculated by grouping the offenses in three separate groups to reflect the three separate sets of victims, see infra) yielded a total of 62 points, whereas for this same group David Williams, Onta Williams and Payen received only 57 points.[2]

However, level 43 is the default maximum under the Guidelines, pursuant to Application Note 2 of Chapter 5, Part A. That is the actual Guideline for total offense conduct for each defendant being sentenced today.

Defendants challenge Probation's calculation in a number of respects. To complete the record, I am ruling on all of the objections below, even though prevailing on any particular objection is meaningless, since only if defendants prevail on enough of them to reduce the total offense level below 43 can their Guidelines sentence be anything less than life imprisonment.

*Objections Common to All Defendants*

Grouping Enhancement Under USSG § 3D1.2 (PSR ¶¶ 46-88) (3 points at stake)

Defendants challenge the Probation Department's grouping decision – specifically, its decision to calculate the Base Offense Level as though the defendants had committed three separate substantive offenses directed to three separate targets (two different synagogue bombing and the wholly separate attack on the Air National Guard Base at Stewart AFB). Defendants argue that, because the offense are "closely interrelated" and "involve[e] substantially the same harm," they should be grouped together for purposes of the multiple count rules, rather than being treated as three separate and independent instances of criminal conduct.

The challenge is overruled. Under USSG § 3D1.2, counts involving substantially the same harm are grouped together when the different counts involve the same victim and two or

---

[1] There is a typographical error in David Williams report at paragraph 83. The "Greater Adjusted Offense Level" should be 57, NOT 60, as is written in the report. That error is repeated in paragraphs 85, 87 and 89. The Probation Department will be directed to correct the report when sentence is imposed.

[2] Cromitie's total offense level for group three was higher than the other defendants because Cromitie's base offense level under guideline 2K2.1(b)(3)(A) was increased as a result of his having been previously convicted of two felony narcotics offenses.

more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan. I agree with defendants that the three planned attacks constituted part of a common scheme or plan, but I disagree with their contention that they involved the same victim – society – because they had no "identifiable" victim and the societal interests involved are closely related. The victims of the three separate attacks on three separate facilities are the congregants and employees of the Riverdale Temple; the congregants and employees of the Riverdale Jewish Center; and the United States (specifically the United States Air Force and its personnel at Stewart AFB). The fact that there was but a single plot to attack all three facilities does not alter this result:

> A primary consideration in this section is whether the offenses involve different victims. For example, a defendant may stab three prison guards in a single escape attempt. Some would argue that all counts arising out of a single transaction or occurrence should be grouped together even when there are distinct victims. Although such a proposal was considered, it was rejected because it probably would require departure in many cases in order to capture adequately the criminal behavior. Cases involving injury to distinct victims are sufficiently comparable, whether or not the injuries are inflicted in distinct transactions, so that each such count should be treated separately rather than grouped together. Counts involving different victims (or societal harms in the case of "victimless" crimes) are grouped together only as provided in subsection (c) or (d).

U.S.S.G. § 3D1.2, Background Section (2010) (emphasis added).

The defense contends that "the number of the targets was decided upon by the government," and that, "It could have been one target just as easily as it could have been twenty targets." (Cromitie Sentencing Memorandum ("Cromitie Mem.") at 6). Essentially, the defense seeks to treat the crimes of conviction as so-called victimless crimes, akin to drug dealing or immigration offenses, as to which harm to a single societal interest comprises the injury. This is wrong. Terrorist attacks directed at specific institutions (if not specific individuals) have identifiable, intended victims. Indeed, the evidence in this case made that clear. See, e.g., GX 113-E4-T, at 2 (Cromitie stating: "I don't give a fuck if a bunch of Jews are in there. I will let it [the bomb] off."), GX 115-E3-T, at 2 (Cromitie referring to the military planes at Stewart: "They bringing 'em [troops] over there [Afghanistan] to do damage to us. So, if they don't have the planes to carry 'em over there, you can't do too much damage."), GX 116-E1-T, at 4 (Cromitie stating: "I don't care if it's a whole synagogue of men."). "Crimes involving multiple victims, even if the offenses arose out of a single event, are properly grouped separately." United States v. Vasco, 564 F.3d 12, 23 (1st Cir. 2009) (defendant's plot to murder-for-hire his wife and daughter resulted in two groups for sentencing purposes, one for each victim, even though he was captured as part of a sting operation).

## Terrorism Base Offense Level Under U.S.S.G. § 2M6.1

Defendants challenge Probation's application of USSG § 2M6.1, which sets the base offense level at 42 "if the offense was committed with intent (A) to injure the United States; or

3

(B) to aid a foreign nation or a foreign terrorist organization." Defendants' argue that this base offense level is not justified by the evidence.

The enhancement is justified by the evidence. There was plenty of evidence in the record that the defendants intended to "injure the United States." They engaged in a plot to fire missiles at U.S. military airplanes, which involved, among other things, (1) surveillance at Stewart Airport, (2) acquisition of what defendants erroneously believed to be real Stinger missiles, and (3) selection of a precise location from which to fire those weapons. Moreover, during the course of the plot, Cromitie and David Williams made statements that plainly confirmed their intent to destroy the military planes and otherwise injure the United States. See, e.g., Tr. 682 (Cromitie stating that he wanted to "do something to America"); GX 102-E3-T, at 2-3 (Cromitie stating that "if the Muslims want the United States down, they can do it. . . . [W]e can do it. . . . [A]ll somebody has to do is give a good fatwa . . . ."); GX 105A-E3-T, at 2 (Cromitie stating: "I am an American soldier. . . . [B]ut not for America."); GX 109-E2-T, at 3 (Cromitie stating that he personally wanted to "take[] out one of these American planes"); GX 109-E3-T, at 9-11 (Cromitie stating that he wanted "to make some type of noise" to make America "calm down"); GX 115-E2-T, at 2 (Cromitie stating: "Imagine if we hit all the [military] planes in one spot. . . . [T]hey'll all blow because they close to each other and they all got gasoline."); GX 120-E2-T, at 14 (David Williams stating: "We got the spot [to fire the missile at Stewart]. Now we gotta find a way . . . outta here."); GX 125A-E1-T, at 9 (David Williams stating that the attacks would "be a hell of a story though. Tell your grandkids."); GX 125A-E2-T, at 5; GX 126-E4-T, at 5 (Cromitie stating: "That's what I'm trying to hit, the motherfucking [military] planes."); GX 126-E4-T, at 12 (David Williams stating: "As long as it get blown up, that's all I care about."); GX 129-E3-T, at 8 (David Williams stating that "[t]he ones that should be hit [are] . . . the [military] cargo planes."). The other two defendants were aware that the intent was to commit an act intended to injure the United States and joined willingly in the plot they thought was designed to accomplish that result.

There was also evidence that the defendants intended to aid a foreign terrorist organization — namely, Jaish-e-Mohammed (JeM), which has been designated as such by the Secretary of State since December 2001. Throughout the plot, each of the four defendants was made aware of the CI's purported affiliation with JeM; they believed that they were carrying out a terrorist attack on behalf of and funded by that organization. See, e.g., Tr. 691 (CI's explaining his affiliation with Jaish-e-Mohammed to Cromitie); GX 107-E1-T, at 3-4, 8 (same); GX 121A-E1-T, at 15-16 (same as to all four defendants); GX 129-E1-T, at 5 (same as to Cromitie and David Williams). As Cromitie told the CI at one point, on behalf of all of the defendants: "We doing everything we supposed to do . . . . [I]t's not about the money. It's about Jaish-e-Mohammed." GX 125A-E5-T, at 1.

Application of a base offense level of 42, pursuant to Section 2M6.1(a)(1), is entirely justified.

Firearms Base Offense Level and 15-Level Enhancement Under U.S.S.G. § 2K2.1

Defendants next contend that, because the Stinger missiles at issue were rendered inoperable by the FBI for use in this case, they qualify neither as a "firearm" under U.S.S.G.

4

2K2.1(a)(1) -- which requires a base offense level of 26 -- nor as a "destructive device" under U.S.S.G. 2K2.1(b)(3)(A), -- which adds to that base offense level a 15-level increase.

Because the defendants were convicted of conspiracy and attempt to acquire, possess, and use Stinger missiles, the applicable guideline is Section 2X1.1(a), which calls for the base offense level from the guideline for the substantive offense (i.e., Section 2K2.1) "plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." U.S.S.G. § 2X1.1; see also id. Application Note 2 ("base offense level will be the same as that for the substantive offense"; "specific offense characteristics from the guideline for the substantive offense that apply are those that are determined to have been specifically intended"). "Where a defendant is to be punished based on conduct that did not actually occur, it is enough that the defendant was aware that [the conduct] was part of the conspiratorial agreement." United States v. Capanelli, 479 F.3d 163, 167 (2d Cir. 2007) (upholding enhancement for brandishing a firearm where that was the object of the conspiracy, even though no firearm was actually brandished).

The fact that the missiles were inoperable is, therefore, of no consequence, because the evidence conclusively established that the defendants believed the missiles were real — that is, they intended to acquire, possess and use real missiles. There was no evidence or argument to the contrary from the defense. Put another way, when viewed from the perspective of what defendants intended — as Section 2X1.1 requires — the "missiles" in this case qualify as a "firearm" under the guideline for the substantive offense, see U.S.S.G. 2K2.1(a)(1)(A)(ii), and as a "destructive device" under the specific offense characteristics, see U.S.S.G. § 2K2.1(b)(3)(A) and Application Note 1 (defining "destructive device"), and 26 U.S.C. § 5845(f)(1)(C) & (D), whether or not they were operable. The defendants' objection that the missiles they handled could not have actually fired "is essentially an argument of factual impossibility" and "is unavailing," because, "The Guidelines punish attempts as severely as completed offenses." United States v. Weisser, 417 F.3d 336, 352 (2d Cir. 2005) (upholding enhancement in a law enforcement sting case based on the facts the defendant believed to be true).

If the above were not the case, I would have to hold a Fatico hearing to resolve how "readily" the Stinger missiles could have been rendered operable. The agent's the testimony that the inert Stingers could have been fitted with live explosive components, see Tr. 2748-49, does not establish how "readily" that could be done (or, just as important for this case, how readily these four defendants – who could not seem to arm a relatively simple IED – could have accomplished the task). However, the Court need not resolve that factual issue, because, whatever the missiles could (or could not) have been altered to do, the defendants all clearly believed they were handling operable anti-aircraft missiles that qualify for the higher base offense level and enhancement contained in the PSR.

Federal Crime of Terrorism Enhancement (U.S.S.G. § 3A1.4)

The defendants mount two separate challenges to Probation's use of the 12 point enhancement for committing a "federal crime or terrorism, which applies when a felony "involved, or was intended to promote, a federal crime of terrorism," and was also "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against

government conduct." 18 U.S.C. § 2332b(g)(5) (cross-referenced in U.S.S.G. § 3A1.4, Application Note 1). The defendants' objections to application of this enhancement are misguided.

First, defendants argue that the use of this enhancement in a case where the base offense level derives from § 2M6.1(a)(1) constitutes impermissible double counting. I am not unsympathetic to defendants' argument – there is a certain element of "piling on" here -- but it is wrong.

The terrorism enhancement under § 3A1.4(a) applies where an offense "involved, or was intended to promote, a federal crime of terrorism." The law permits use of multiple guidelines adjustments based on the same underlying conduct, as long as the adjustments at issue "do not serve identical purposes, but rather address separate sentencing considerations." United States v. Volpe, 224 F.3d 72, 76 (2d Cir. 2000). For example, the Second Circuit has held that the terrorism enhancement, which covers "acts of terrorism," addresses separate sentencing considerations from both the hate crime enhancement (U.S.S.G. § 3A1.1, which covers the selection of victims based on their national origin or religion), and the government victim enhancement (U.S.S.G. § 3A1.2(b), which "deals with the selection of victims based on their status as government employees." In re Terrorist Bombings of U.S. Embassies in E. Afr., 152 F.3d 93, 153 (2d Cir. 2008), the Court of Appeals concluded that application of all three enhancements did not result in any "double counting," much less impermissible "double counting"). By this logic, the same holds that application of the terrorism enhancement is not impermissible "double counting" when the base offense level is calculated using § 2M6.1(a)(1), because terrorist acts are not always intended to injure the United States or to aid a foreign terrorist organization, and plots to injure the United States or aid a foreign terrorist organization do not always involve acts of terror.

Second, defendants are wrong to suggest that a jury must find the facts supporting application of this enhancement. On the contrary, the underlying facts may be found by the sentencing judge, and only by a preponderance of the evidence. See United States v. Awan, 607 F.3d 306, 317 (2d Cir. 2010).[3]

Third, the Second Circuit has made clear that the law requires a showing only of a specific intent "to commit an offense that was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." Id. (emphasis added). The defendant's "motive is simply not relevant." Id. Rather, the relevant question is whether the defendant knew that the offense was so calculated:

> If the evidence showed that Awan engaged in criminal
> conduct with knowledge that confederates solicited his actions
> to effectuate politically motivated bombings in India, or homicidal
> attacks on that country's security forces or its political leaders, such
> proof could demonstrate that Awan's crimes were calculated to influence
> the conduct of government even if he was not personally motivated

---

[3] Were this result incorrect, any error would be harmless because the resulting change in the total offense level would make no difference.

by that object.

Id. at 317-18).

The CI made the objective of the "mission" clear. As he explained to all four defendants, his terrorist organization, JeM, was engaged in a "jihad" for the purpose of , "tell[ing] the Americans. . . . [t]o get out of Afghanistan and Saudi Arabia." GX 121A-E1-T, at 15. So there would be no doubt, the CI added that "[t]his" — meaning the attacks they were planning — "is to send them [the United States] a message." Id.

The defendants never questioned or indicated any disagreement with the CI's stated objective for the mission. Several of them even made assorted comments evincing their agreement with it. See, e.g., GX 125A-E5-T, at 1 ("It's about Jaish-e-Mohammed"); id. at 4 (we are doing this "for Allah"); Tr. 2528 ("So if we kill them here, it would all be equal"). Most important, they carried out what they believed was a real terrorist plot with knowledge of the stated objective. In other words, the defendants committed offenses they believed were "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." That authorizes the use of the enhancement.

Targeting Official Victims (U.S.S.G. § 3A1.2).

The PSR properly applies the enhancement for targeting "official victims." "[A]n individual need not be harmed, or even knowledgeable of the crime, to be a victim." United States v. Drapeau, 188 F.3d 987, 991 (8th Cir. 1999). "Just because federal . . . employees . . . were not [actually] killed or injured or that [the defendants] did not know the names of [their] intended victims does not preclude application of the three-level enhancement." United States v. Polk, 118 F.3d 286, 298 (5th Cir. 1997) (affirming imposition of enhancement in sting case where the defendant told a CI that he wanted to attack an IRS service center and prepared accordingly). There is no requirement that federal employees "be named for the three-level enhancement to apply." Id. at 298 n.1. Instead, for purposes of this enhancement, "'Any attempt [or conspiracy] to cause injury or damage is basically the same crime as actually succeeding in causing the injury or damage.'" United States v. Drapeau, 121 F.3d 344, 348 (8th Cir. 1997) (quoting district court that applied the enhancement).

Here, as in Polk, "there can be no doubt that [the defendants] intended to kill, injure, or maim federal employees [at the Air National Guard Base] solely because those persons worked for the [U.S. government]." 118 F.3d at 298. Indeed, the jury's guilty verdict on Count Seven established beyond a reasonable doubt that all four defendants conspired to kill "officers and employees of the United States" "while such officers and employees were engaged in and on account of the performance of official duties." (Indictment ¶ 11). The Court instructed the jury that, to convict the defendants of Count Seven, it needed to find the existence of a conspiracy whose object was "to murder officers or employees of the United States or people assisting them, while those officers or employees or assisting persons were in the performance of their official duties." Tr. 3481. The jury's finding that the defendants were so motivated extends to the

related Counts, Five and Six, and provides the necessary predicate to impose the enhancement. See, e.g., United States v. Hunter, 985 F.2d 1003, 1007-08 (where jury convicted defendant of threatening federal judges, in violation of 18 U.S.C. § 115, "This finding meets the requirements of U.S.S.G. § 3A1.2 and mandates the application of a three-level enhancement"), withdrawn as moot, 1 F.3d 843 (9th Cir. 1993). Accordingly, the PSR properly includes the official-victim enhancement in calculating the range applicable to Group Three.

Hate Crime Enhancement (U.S.S.G. § 3A1.1(a))

In a case that goes to trial, the hate crime enhancement may be imposed only where the jury determines "beyond a reasonable doubt that the defendant intentionally selected any victim or any property as the object of the offense of conviction because of the . . . religion [or] ethnicity . . . of any person," U.S.S.G. § 3A1.1(a). However, no special verdict is required to impose this enhancement. See, e.g., In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d 93, 153 (2d Cir. 2008) (upholding hate crime enhancement after defendant was convicted by a jury of conspiring to murder U.S. nationals); see also United States v. Pospisil, 186 F.3d 1023, 1031 (8th Cir. 1999) (upholding enhancement based on jury instructions).

The guilty verdicts on Counts Two and Three established that all four defendants attempted to bomb two synagogues in the Bronx. Because the targets of those offenses were places of worship, and because the jury, in convicting the defendants on those counts, necessarily found that the defendants deliberately decided to attack those specific places, the jury's verdict necessarily implies that the victims were selected for attack because of their religion. Here, as in Terrorist Bombings, where it was sufficient to establish that the defendants conspired to kill U.S. nationals, "it is the very fact that [the defendants were] convicted of these offenses that justifies the application of the hate crime . . . enhancement." Id. at 153. Additionally, the trial record established that at least defendants Cromitie and Williams agreed to target the synagogues in Riverdale because of their dislike of Jews. See, e.g., GX 113-E4-T, at 2 (Cromitie stating: "I don't give a fuck if a bunch of Jews are in there. I will let it [the bomb] off."; "[Jews are] the most wickedest people that Allah has created."); GX 125A-E1-T, at 1-3 (David Williams identifying as a potential target for attack an area near a synagogue in Brooklyn: "Yeah. The whole strip. It's like man, it's all Jews."); GX 126-E1-T, at 4 (Cromitie stating: "These fucking Jews get me sick.").

*Objections Specific to Particular Defendants*

James Cromitie

Cromitie is the only defendant to whom Probation assigned a defendant-specific enhancement: his adjusted offense level was 63 prior to receiving 2 points for being an "organizer, leader, manager, or supervisor," of the "sutra team." This would raise his total offense level to 65.

Cromitie challenges application of the two-level role adjustment under U.S.S.G. § 3B1.1(c). He claims that the only "organizer, leader, manager, or supervisor" of the plot was the

CI. Indeed, the Government, through the CI, devised the planned attacks and provided the defendants with everything they needed to effectuate the plan: weapons of mass destruction, transportation, money, and not least, logistical guidance.

The Government argues that the two points are warranted, for four reasons.

First, it contends that the defendants selected Cromitie to be their leader. See GX 125-E1-T, at 2 (Payen's telling CI that the team needed a leader); GX 125A-E1, at 3-5 (all four defendants agreeing that, while everyone would have input, Cromitie would be the leader).

Second, Cromitie was responsible for recruiting the three other defendants. See GX 240-T ("The brother Daoud said salam alaykum too"); GX 121-E1-T, at 1 ("We got two more brothers, Hak."). It is immaterial whether, as the defense contends, Cromitie was simply passing along the CI's "offer for cash": what matters is that Cromitie located his co-conspirators and introduced them to the CI, and there is no debate about that.

Third, the Government alleges that Cromitie participated in the planning of the attacks to a far greater degree than the other defendants: he discussed the attacks with the CI for months and months before the others entered the scene.

Finally, the Government claims that Cromitie was tasked with the most prominent role in the attacks themselves. It was Cromitie who planted the bombs by their targets in the Bronx, while the others served as lookouts. And it was Cromitie who was "supposed" to fire the Stinger missiles at the military planes -- although I put "supposed" in quotation marks to emphasize that the Government never really intended to have the defendants proceed to Stewart AFB or try to fire anything at an airplane.

I reject the Government's argument that any or all of the above warrants a two point enhancement for organizational or leadership role.

There was one and only one "organizer, leader, manager [and] supervisor" of this operation, and it was the United States Government, acting through its agent, the Confidential Informant. The CI and his handlers devised all the plans, identified all the targets, picked all the operative dates, and supplied all the transportation, maps, cameras, "weapons," meeting places, storage facilities and money for the operations. Every logistical detail of the "mission" was orchestrated, financed and facilitated by the CI and the FBI. The case agent himself admitted at trial that the Government was pretty much in control of what the defendants were doing when they were with the CI. Tr. 269.

Cromitie was indeed involved in discussions with the CI for far longer than his co-defendants, but that does not make him a leader of this enterprise. He talked the talk of attack for months, not just for weeks, but throughout that period he proved that he was either utterly incapable of planning or organizing anything, or utterly unwilling to do so. As a result, it is ludicrous for the Government to cite the length of Hussain's courtship of Cromitie as having conferred a leadership role on him.

9

While it is true that Cromitie probably roped in the other three defendants (two for sure), that without more does not make him their "leader." The CI was desperate to have the defendants identify someone as a "leader," no doubt for evidentiary reasons. But the locus of real leadership in this operation shines through; and it was Robert Fuller and Shaheed Hussain, not James Cromitie, who exercised that role. Since this enhancement was applied three times, this will result in multiple changes to Cromitie's PSR, which will be announced at sentencing.

## David Williams

With respect to David Williams's criminal history calculation, the Government believes two points should be added, for a score of 12 (PSR ¶ 119), because David Williams committed the instant offense while on a conditional discharge from his December 6, 2008 sentence (PSR ¶ 114). See U.S.S.G. 4A1.1(d); United States v. Labella-Szuba, 92 F.3d 136, 138 (2d Cir. 1996). As David Williams has been convicted of a federal crime of terrorism, his criminal history category is VI, as calculated by the PSR, so the additional points are irrelevant. See U.S.S.G. § 3A1.4(b). However, the Government appears to be correct. (See PSR ¶ 119).

David Williams asks that the PSR's description of the phrase "Allah Akbar," which is tattooed onto his wrist, as a "Muslim war cry" (PSR ¶ 136), be stricken from the report. That application is granted. While the words "Allah Akbar" (which translates as "God is Great") have been used as a war cry, they are also words used by the muzzein in the call to prayer. Every good Muslim must recite them during each stage of the obligatory prayers (the prayers that are recited five times a day) and also during the superrogatory prayers (voluntary prayers). See en.wikipedia.org/wiki/Takbir.

The Government argues that the defendant's conduct in this case and the location of his tattoos affords a factual basis for inferring that Williams intended the more violent reading. See, e.g., GX 129-E2-T, at 2 (David Williams stating with respect to carrying out the attack plan: "It's for Allah, so there's nothing really I can say."). I can make no such finding, and I have no intention of holding a Fatico hearing on an issue that is both utterly collateral and, in the end, utterly meaningless.

## Onta Williams

Onta Williams seeks a downward adjustment of 4 levels for minimal participation, pursuant to U.S.S.G. § 3B1.2(a). (See Onta Williams Sentencing Memorandum ("O. Williams Mem.") at 3). The application is denied. Mr. Williams cannot be characterized as a minimal, or even minor, participant under Second Circuit law.

A mitigating role adjustment under Section 3B1.2 is appropriate only when a defendant is "substantially less culpable than the average participant," that is, "less culpable than most other[s]" who are "criminally responsible for the commission of the offense," U.S.S.G. §§ 3B1.1, comment. (n.1), 3B1.2, comment. (nn. 1, 3(A), 5) (emphasis added), when compared to "'to the average participant in such a crime,'" not merely his co-conspirators, United States v. Carpenter, 252 F.3d at 235 (quoting United States v. Rahman, 189 F.3d 88, 159 (2d Cir. 1999)); *accord*, e.g., United States v. Jeffers, 329 F.3d 94, 103 (2d Cir. 2003); United States v. Yu, 285 F.3d 192,

200 (2d Cir. 2002). A defendant's role is "minimal" when he is "plainly among the least culpable of those involved in the conduct of the group," as indicated by his "lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others." U.S.S.G. § 3B1.2 comment. (n.4). A defendant has a "minor" role when he "is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2(b) & comment. (n.5).

Based on these standards, courts in the Second Circuit have routinely denied mitigating role adjustments to defendants who, like this one, contend they were "merely" lookouts, finding instead that their participation in the criminal venture was indispensable to its success. See, e.g., United States v. Aponte, 31 F.3d 86, 88 (2d Cir. 1994) ("Because there is evidence that [defendant] was involved in the planning of the . . . robbery and served as a look-out, we sustain the district court's conclusion that [defendant] did not play a minor or minimal role."); United States v. Pitre, 960 F.2d 1112, 1127 (2d Cir. 1992) (affirming denial of mitigating role adjustment where there was evidence that defendant "was aware of the full extent of the transaction" and "acted as a look-out during the instant transaction and was present during at least one prior narcotics transaction involving" his co-conspirators); United States v. Vargas, 170 Fed. Appx. 779, 780-81 (2d Cir. Mar. 17, 2006) (unpublished decision) (affirming denial of adjustment to "lookout"); United States v. White, 113 F.3d 1230, 1997 WL 279972, at *3 (2d Cir. May 23, 1997) (unpublished decision) ("[Defendant's] culpability in the attempted robbery was not minor on any measure: the evidence showed that he originally suggested the robbery plan, actively planned the robbery using inside knowledge of the plant, opened the plant door, and served as a lookout for the police."); United States v. Batista, 732 F. Supp. 2d 82, 89 (E.D.N.Y. 2010) (denying role adjustment to defendant who "provided a valuable and unique service to the conspiracy that helped the conspiracy avoid detection by law enforcement, and [who] had knowledge of the scope and structure of the illicit enterprise"); Delrosario v. United States, No. 00 CR. 121 (RCC), 03 Civ. 1654 (RCC), 2005 WL 1639420, at *3 (S.D.N.Y. July 12, 2005) (denying adjustment to "lookout"); Rodriguez v. United States, No. 91 Civ. 6724 (PNL), 1992 WL 183757, at *3 (S.D.N.Y. July 21, 1992) (denying adjustment to "lookout").

Measured against those cases, Onta Williams was not a minimal, or even minor, participant in the offenses of conviction. The first thing Williams did when he met the CI was offer to get him guns. See GX 121-E5-T, at 1 ("Yeah, I need like two of them ASAP."). He carefully assessed the risks associated with each segment of the operation. See GX 125A-E1-T, at 9 ("The shit in the Bronx, that's . . . like, adolescent. . . . Compared to [the planes, which is] the major leagues."). It was Onta Williams, on the night before the attacks, who was leading the operational planning session at the Shipp Street house, describing the best getaway routes and imploring the others to take care because there would be "top investigators on this." GX 127-E1-T, at 2-4. He handled the bombs and the missiles, fully aware of what was at stake. See GX 125A-E2-T, at 5 (predicting that the twin attacks were "gonna be a double whammy"). Finally, on the night of the planned attack, Williams helped move the weapons from storage to their intended targets, and then "provided a valuable and unique service to the conspiracy that helped the conspiracy avoid detection by law enforcement" by standing on a corner, looking out for the police. United States v. Batista, supra., 732 F. Supp. 2d at 89. In short, Williams was far from being just "along for the ride," as he now claims. (O. Williams Mem. at 3).

11

<u>Conclusion</u>

The total offense level computation for Cromitie is 63, David Williams 60 and Onta Williams 60. However, pursuant to Application Note 2 of Chapter 5, Part A (see supra), the adjusted offense level for each defendant is 43.

Because of the terrorism aspect of the case, the criminal history level for each defendant is Level VI.

This constitutes the decision and order of the court.


Dated: June 29, 2011

_____
U.S.D.J.

BY ECF TO ALL COUNSEL

12