UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————————x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/27/2023

UNITED STATES OF AMERICA

V.                                                               09 CR 558 (CM)

DAVID WILLIAMS, ONTA WILLIAMS
and LAGUERRE PAYEN,

Defendants.

—————————————————————————x

DECISION AND ORDER ON DEFENDANTS' MOTIONS FOR COMPASSIONATE RELEASE

McMahon, J.:

In October 2010, David Williams, Onta Williams, and Laguerre Payen were convicted, together with James Cromitie, of conspiracy to use weapons of mass destruction, conspiracy to acquire and use anti-aircraft missiles, conspiracy to kill officers and employees of the United States, three counts of attempted use of weapons of mass destruction, and one count of attempted acquisition and use of anti-aircraft missiles—all in connection with their participation in an FBI-orchestrated conspiracy to bomb a Jewish community center in the Bronx and to destroy military aircraft at the New York Air National Guard Base at Stewart Airport in Newburgh, New York. David Williams, but not Onta Williams or Payen, was also convicted of attempting to kill officers and employees of the United States. For these crimes, the Defendants were sentenced in 2011 to a mandatory minimum term of 25 years imprisonment.

Before the Court are separate motions filed by each of the defendants asking the Court to reduce their sentences on compassionate release grounds, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). The moving defendants raise a variety of arguments that were litigated on their direct appeals and

1

subsequent § 2255 habeas petitions; for example, they argue that they should be released because their convictions were the consequence of an abusive, selective and racist prosecution. Arguments that attack the validity of defendants' underlying convictions are not appropriately considered on a motion for compassionate release. *See United States v. Amato*, 48 F.4th 61, 63 (2d Cir. 2022).[1]

However, the moving defendants[2] assign a number of other grounds for granting them compassionate release, including that their Government-engineered mandatory minimum sentence imposed on them, while legal, was overly harsh and unjust; the effects of confinement during the COVID pandemic; rehabilitation over the 14 years they have been incarcerated; and various health related concerns, including, in Payen's case, severe mental illness. Those issues are properly before the court, and I will rule on them.

The Government urges the Court to deny the defendants' motions, arguing that the defendants have not established any "extraordinary and compelling" reason(s) warranting a reduction in sentence, and because a reduction in sentence would not be appropriate based on the factors set forth in 18 U.S.C. § 3553(a).

Defendants' arguments are persuasive; the Government's are not. The motions are granted.

How Defendants Came to Commit the Crimes of Conviction

A person reading the crimes of conviction in this case would be left with the impression that the offending defendants were sophisticated international terrorists committed to jihad against

---

[1] The actual (and limited) holding in *Amato* is that a court may not consider "new evidence" introduced to attack the validity of an underlying conviction when deciding a compassionate release motion, because such matters should be raised on direct appeal or in a habeas petition. *See United States v. Amato*, 48 F.4th at 63. None of the moving defendants proffers any new evidence that goes to the validity of his underlying conviction; they merely regurgitate an argument about selective prosecution that was long ago examined and found wanting by this court and by the Second Circuit.

[2] The lead defendant, James Cromitie, has not filed a motion for compassionate release, although counsel for Payen advises that she reached out to Cromitie on two occasions to see if he wanted to join in the motion. Payen Motion at 2, n.1.

the United States. However, they were, in actual reality, hapless, easily manipulated and penurious petty criminals.

There is no need to rehash in detail the court's lengthy and detailed description of how the crimes of conviction came to be; the reader is referred to its decision reluctantly denying that motion. *See United States v. Cromitie*, 781 F. Supp. 2d 211, 225 (S.D.N.Y. 2011), aff'd, 727 F.3d 194 (2d Cir. 2013). For our purposes, suffice it to say the following: non-moving defendant Cromitie, the lead defendant in this case, was the object of a lengthy sting operation conducted by the FBI with the aid of a most unsavory "confidential informant," Shaheed Hussain.[3] Hussain's task was to infiltrate upstate mosques (attended largely by members of the Black Muslim movement within Islam) and identify potential terrorists. Cromitie, a small time grifter and petty drug dealer with no history of violence, pretended to be one, feeding Hussain lie after lie about his past and ingratiating himself with the man he believed to be a wealthy Pakistani businessman. Over a period of about eight months, Hussain inveigled Cromitie with promises of both heavenly and earthly rewards, including as much as $250,000, if he would plan and participate in, and find others to participate in, a jihadist "mission." Cromitie professed interest in often deeply offensive anti-Semitic and anti-American rhetoric but, backing his words with absolutely nothing in the way

---

[3] As was revealed on cross examination, in the years prior to his becoming an FBI asset, Hussain engaged repeatedly in activity that constituted various crimes, including bankruptcy fraud, tax evasion, immigration fraud, perjury and mail fraud. He lied repeatedly to a laundry list of government agencies, from the United States Bankruptcy Court for the Northern District of New York, to the sentencing judge in his criminal case, his Probation Officer, the FBI, the INS, the IRS, the New York State Liquor Authority and the New York State Education Department. He even lied on the witness stand at the trial of this case, putting the Government in the uncomfortable position of not being able to rehabilitate certain aspects of his testimony or adopt certain of his statements when arguing the case. More recently, Hussain was the owner of a car-for-hire business in Upstate New York that rented a defective stretch limousine – a vehicle that had been ordered out of service following a safety inspection–that hurtled down Route 30 in Schoharie, New York, sending 21 innocent people to their deaths. Newman, Weiser and Rashbaum, "Limo Company Owner in Crash Revealed as FBI Informant, Recruiter of Terrorists, Fraudster," *New York Times* (Oct. 9, 2018), available at https://www.nytimes.com/2018/10/09/nyregion/limo-owner-fbi-informant-shaheed hussain.

3

of deeds.  He strung Hussain along for six months, only to disappear for a long period-- so long that the FBI started to move on to other ventures.

However, in early April 2008, Cromitie – by now unemployed and broke – reached out to Hussain and agreed to participate in a "mission." Over the course of the next few weeks, at Hussain's direction, he recruited David and Onta Williams and Laguerre Payen, to serve as "lookouts" while Cromitie planted "bombs" manufactured by the FBI at a synagogue and community center in Riverdale. None of these three defendants had any history as terrorists; like Cromitie, they were impoverished small time grifters and drug users/street level dealers who could use some money. Payen in particular was of questionable mental acuity. The three men were recruited so that Cromitie could conspire with someone; the real lead conspirator was the United States, but Cromitie could not conspire with the Government.

Nothing about the crimes of conviction was defendants' own doing. The FBI invented the conspiracy; identified the targets; manufactured the ordnance; federalized what would otherwise have been a state crime (the Bronx "bomb" plot) by driving three of the four men (Onta Williams was not available) into Connecticut to view the "bombs" and "stinger missile launchers" that would be used in the operation; and  picked the day for the "mission" (which was filmed in real time so it could be shown on television news the night the men were arrested). On May 20, Hussain drove the four men to Riverdale (they had no way to drive themselves); "armed" the "bomb" (because the hapless Cromitie, despite his "training," could not figure out how to do it); and told Cromitie how to place the device while David Williams, Onta Williams and Payen performed lookout duty. As soon as the fake device was left by the community center door, law enforcement arrested the four men.

The sting operation included the planned attack on Stewart AFB using "stinger missiles" in order to subject the four men to the statutory mandatory minimum sentences of 25 years.[4] After the men were convicted, that sentence was imposed. The court said at the time: "There is no doubt in my mind that the mandatory minimum sentence I must impose here . . . which is 25 years, is sufficient, *probably greater than necessary*, to punish you for what happened here and for what did not happen here." *See* Sentencing Transcript for Laguerre Payen, 9/7/11, at 21 (Emphasis Added).[5] However, my hands were tied.

The defendants challenged their sentence, in post-trial motions and on appeal, as the product of governmental sentencing manipulation, but this court reluctantly concluded, in a decision affirmed by the Second Circuit, that there was no such thing as "sentencing entrapment," so the sentence, while unjust, was legal. *United States v. Cromitie*, No. 09 CR. 558 CM, 2011 WL 2693297 (S.D.N.Y. June 29, 2011), aff'd, 727 F.3d 194 (2d Cir. 2013).

All direct appeals and collateral attacks on their convictions (challenged principally as entrapment) and their sentences failed. The moving defendants have served over 14 years of their 25-year mandatory minimum sentences. This is their first motion for compassionate release.

### Compassionate Release

Per 18 U.S.C. § 3582(c), a district court "may not" modify a term of imprisonment once imposed, except under limited circumstances. One such circumstance is the so-called compassionate release provision, which provides that a district court "may reduce the term of imprisonment" where it finds "extraordinary and compelling circumstances." § 3582(c)(1)(A)(i). A motion under this provision may be made by either the Bureau of Prisons or a defendant, but in

---

[4] The Conspiracy (Count 5) and Attempt (Count 6) to Acquire and Use Anti-Aircraft Missiles counts carried a mandatory 25-year minimum sentence.

[5] The statement applied to all four defendants.

5

the latter case only "after the defendant has *fully exhausted all administrative rights* to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.* (emphasis added). Thus, where a compassionate release motion is brought by a defendant who has not "fully exhausted all administrative rights," the district court "may not" modify his term of imprisonment.

If a defendant demonstrates that he has exhausted his administrative remedies with the BOP, the Court must then consider whether the defendant has met his burden of establishing "extraordinary and compelling circumstances" warranting release.[6] In the past, this Court—and many of my district court colleagues—looked to United States Sentencing Guidelines § 1B1.13 (the applicable Guidelines section for sentencing reductions pursuant 18 U.S.C. § 3582(c)(1)(A)(i)), for guidance on what constituted "extraordinary and compelling circumstances."[7] That changed on September 25, 2020, when the United States Court of Appeals for the Second Circuit held that § 1B1.13 is not applicable to a motion brought by a defendant in

---

[6] "A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue." *See, e.g., United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992).

[7] The Application Notes to Section 1B1.13 describe the circumstances under which "extraordinary and compelling reasons" exist. *See* § 1B1.13 comment (n.1). For example, the medical circumstances ground reads as follows:

(A)   Medical Condition of the Defendant—

    (i)   The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia

    (ii)   The defendant is—
        (I)   suffering from a serious physical or medical condition,
        (II)   suffering from a serious functional or cognitive impairment, or
        (III)   experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self- care within the environment of a correctional facility and from which he or she is not expected to recover.

*Id.* § 1B1.13 comment (n.1).

6

the district court. *United States v. Brooker* No. 19-32180-CR, 2020 WL 5739712, at \*6 (2d Cir. Sept. 25, 2020). The Second Circuit reasoned that the language of § 1B1.13—language that had not been updated since the passing of the First Step Act—addressed only sentencing reduction motions initiated by the Bureau of Prisons. *Id.* In making clear that the district court was not constrained by the narrow grounds for granting compassionate release in § 1B1.13, the Second Circuit declared unequivocally that "district courts have discretion to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before [the court] in motions for compassionate release," and that "neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion." *Id* at \*7. The only caveat is last year's pronouncement, in *Amato*, supra., that a district court may not consider on a compassionate release motion "new evidence proffered for the purpose of attacking the validity of the underlying conviction" (*United States v. Amato*, 48 F.4th at 63), because such attacks are only properly made on direct appeal or *via* habeas. As noted above, the defendants have raised some arguments that, while hardly new, attack the validity of their convictions – arguments already raised and rejected in earlier filings. Those arguments will not be considered by the court.

In considering a compassionate release motion, the court looks to the whole record. Even if any one asserted ground for relief, considered individually, does not rise to the level of "extraordinary and compelling grounds" for compassionate release, that same ground, when considered as part of the totality of the record, can support achievement of the statutory standard. *See e.g.*, *United States v. Clark*, No. 97 CR. 817 (DC), 2021 WL 1066628, at \*4 (S.D.N.Y. Mar. 18, 2021).

Importantly, what *Brooker* did not change is the mandate in § 3582(c)(1)(A)(i) that a court contemplating a defendant's release pursuant to that section must also consider the sentencing

factors at 18 U.S.C. § 3553(a), to the extent they remain applicable, and determine whether they counsel for or against release. A court always retains discretion to deny a motion for compassionate release if, in its view, the § 3553(a) factors override what would otherwise be extraordinary and compelling circumstances.

### Defendants Exhausted Their Administrative Remedies in the Bureau of Prisons

David Williams submitted a request for compassionate release to the warden of USP Pollack, and it was denied on May 18, 2020.

Onta Williams made an application for compassionate release through counsel to the warden of FCI Lompoc in July of 2020, which received no response. Mr. Williams filed subsequent motions with varying acting wardens at FCI Lompoc, and similarly received no response.

Payen submitted a request for compassionate release to the warden at USP Allenwood, and it was denied on April 8, 2020.

The Government agrees that the defendants have satisfied their exhaustion requirement.

Accordingly, the Court finds that the defendants have exhausted their administrative remedies under 18 USC 3582(c)(1)(A), and the present motions for compassionate release are properly before the Court.

### The Motions Are Granted Because Extraordinary and Compelling Circumstances Exist and the 3553(a) Factors Do Not Counsel Against Release

*1. The Extraordinary Length of the Defendants' Sentence, Which Was Entirely the Product of the Government's Conduct, Qualifies as An Extraordinary and Compelling Circumstance Warranting Compassionate Relief*

Defendants deserve sentences commensurate with their crimes, and these defendants committed serious crimes. Here, however, the Government—in its understandable zeal to identify and capture individuals who would to do harm to the United States—used an unscrupulous

8

operative to inveigle four impoverished men (principally by promising them money) into agreeing to commit serious terrorism offenses that they never could have dreamed up on their own, and then manipulated the facts of the offense so that the men had to be sentenced to at least 25 years in prison. There can be no doubt – in my mind there has never been the slightest doubt -- that the Government's purpose in adding to the conspiracy the plot to shoot "stinger missiles" at military aircraft at Stewart Air Force Base was to make sure that the defendants had to be sentenced to at least 25 years imprisonment. This is not mere supposition: Reports produced during discovery revealed that the FBI and the United States Attorney's Office were well aware, when setting up the sting, that it was baking in a sentence of that length should the defendants be convicted. *See* 3501-313-314 (referring to discussions with the AUSA).

The defendants' argued that this constituted "unfair sentencing manipulation" or "sentencing factor manipulation," both as part of their post-trial motion alleging outrageous misconduct on the part of the Government, and again at sentencing in a vain effort to avoid the inevitable. Unfortunately for them, there was nothing illegal about the Government's manipulating the facts of the sting in a way that tied the court's hands at sentencing.

But the fact that what the government did was legal does not, as Judge Posner observed in *United States v. Kindle*, 698 F.3d 401, 414 (7th Cir. 2012), make it just. Twenty-five years -- a quarter of a century -- is a very long time indeed, especially where, as here, there was no actual danger to anyone. I remain today, as I was at the time of sentencing, convinced that the sentences imposed on the Newburgh Four were greater than necessary to effectuate any of the statutory goals of sentencing. The question raised by the present motion is whether defendants' unjustly long sentences—either standing alone, or in combination with other factors—can satisfy the

9

extraordinary and compelling standard necessary to grant a sentence reduction, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).

Courts of Appeal in this Circuit and others have made it clear that compassionate release under the First Step Act, 18 USC 3852(c)(1)(A), may be granted for *any* extraordinary and compelling reason, other than one that collaterally attacks the validity of the underlying conviction. *United States v. Brooker*, 976 F.3d 228 (2nd Cir. 2020) (Emphasis added); *United States v. McCoy*, 981 F.3d 271 (4th Cir. 2020); *United States v. Shkambi*, 2021 U.S. Dist. LEXIS 82799 (5th Cir. 2021); *United States v Aruda*, 993 F.3d 797 (9th Cir. 2021); *United States v. Maumau*, 993 F.3d 821 (10th Cir. 2021); *United States v. Amato*, *supra.*, (new evidence collaterally attacking conviction may not be considered on compassionate release motion, but must be raised *via* habeas).

Among the extraordinary and compelling reasons courts have cited when considering compassionate release motions post-*Brooker* is the severity of a defendant's sentence, especially relative to his actual criminal behavior. For instance, defendants who were given extremely long sentences under the then-mandatory Sentencing Guidelines, despite their minimal participation in a drug enterprise, have been granted compassionate release, based in part on the perceived unfairness of their original sentence, So have defendants who were sentenced under subsequently invalidated laws or practices. *See, e.g.*, *United States v. Vargas*, 502 F. Supp. 3d 820, 826–27 (S.D.N.Y. 2020) (collecting cases): *United States v. Parker*, 461 F. Supp. 3d 966, 985 (C.D. Cal. 2020) (considering "the severity of [defendant's] life sentence, imposed under a sentencing regime that is no longer valid," as part of the extraordinary and compelling reasons justifying compassionate release); *United States v. Haynes*, 456 F. Supp. 3d 496, 514 (E.D.N.Y. 2020) (deeming the "brutal impact of [defendant's] original sentence" and "its harshness as compared to sentences imposed on similar and even more severe criminal conduct today" to be an extraordinary and compelling reason warranting relief); *United States v. Marks*, 455 F. Supp. 3d 17, 36

(W.D.N.Y. 2020) (holding that, while the retroactivity provisions of the FSA did not apply directly to defendant, the FSA still "evidences Congress's intent to mitigate the harsh and sometimes unjust effects of the sentencing laws"); *United States v. Redd*, 444 F. Supp. 3d 717, 722–24 (E.D. Va. 2020) (finding discrepancy between defendant's 603-month sentence — imposed under mandatory Guidelines and prior practice of "stacking" § 924(c) charges — and modern sentences for same conduct to constitute extraordinary and compelling reason justifying compassionate release); *see also United States v. Curtis*, No. 03-CR-533, 2020 WL 1935543, at *3 (D.D.C. Apr. 22, 2020) (considering harshness of defendant's sentence in evaluating the § 3553(a) factors).

The fact that a lengthy sentence was compelled by the government's manipulation of the facts in connection with a sting operation has been held to be relevant when considering whether a sentence qualifies as unduly harsh– even though such a sentence was not illegal. Particularly instructive here are a series of "stash house sting" cases from the Seventh Circuit, most recently *United States v. Conley*, 2021 U.S. Dist. LEXIS 40763 (N.D. Ill. 2021). Conley was snared in a Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) sting operation. Not unlike what happened in this case, "the AFT's practice involved enticing individuals, most of whom were impoverished racial minorities, into conspiring to rob fictitious stash houses of fictitious drugs or money operated by fictitious drug dealers." *Conley*, 2021 U.S. Dist. LEXIS 40763at 1-2 (internal citations omitted).

In granting Conley's motion for compassionate release, the court noted that "federal courts have considered….the injustice of lengthy sentences when granting compassionate release motions." Noting the "inherent unfairness and injustice of Conley's sentence" and the fact that "the Court's hands were tied by the fake drug amount...that the government arbitrarily decided was in the fake stash house," the district judge who imposed that sentence concluded that the unduly

11

harsh sentence qualified as an extraordinary and compelling factor justifying compassionate release. *Conley*, 2021 U.S. Dist. LEXIS 40763 at 9-10. *See also United States v. White*, 2021 U.S. Dist. LEXIS 146891 (N.D. Ill. 2021) (a similar stash house sting case reciting the same unjust minimum sentence scheme in granting a defendant's compassionate release motion); *United States v. Logan*, 2023 US Dist. LEXIS 58636 (NDIL 2023) (release granted in sting operation where the mandatory minimum sentence was the result of government choices). The district court took note of prior stash house cases, where the Seventh Circuit had decried the "tawdry" nature of the sting operations "directed at unsophisticated, and perhaps desperate defendants who easily snap at the bait put out for them by [the ATF agent]." *Conley*, 2021 U.S. Dist. LEXIS 40763 at 5 (citing *United States v. Lewis*, 641 F.3d 773, 777 (7th Cir. 2011). The court also cited *United States v. Kindle*, 698 F.3d 401, 414 (7th Cir. 2012), in which Judge Posner, concurring, said, "Stings are a disreputable tactic. Law enforcement uses them to increase the amount of drugs that can be attributed to the persons stung, so as to jack up their sentences."

And the Circuit also observed that the district judge in Conley's case "was dismayed that it was forced into a minimum sentence based on the government's ability to control the sentence by manipulating the amount and type of drugs that were 'in' the fictitious stash house." *Conley*, 2021 U.S. Dist. LEXIS 40763 at 6, 11-12 (citing *United States v. Conley*, 875 F.3d 391, 402 (7th Cir. 2017)). Indeed he was: the district court had described the sentence he was forced to impose as "devoid of true fairness...and will serve no real purpose other than to destroy any vestiges of respect in our legal system and law enforcement that this defendant and his community may have had." (*Id.*)

The fact that a sentence imposed was the mandatory minimum sentence available at the time of sentencing has not stopped courts from granting compassionate release relief under the

First Step Act on the ground that the original sentence was unduly harsh. Most recently, United States Circuit Court Judge Denny Chin, sitting by designation on this court, granted compassionate release to a defendant he had sentenced 21 years ago to life in prison for committing conspiracy to commit bank robbery. *See United States v. Vernon Snype*, (02-cr-939-03 (DC)), Dkt. No. 151, Compassionate Release Decision, dated 7/19/2023. Although a conviction for conspiracy to commit bank robbery generally exposes a defendant to a maximum prison term of five years, *see* 18 U.S.C. § 371, Judge Chin was compelled to sentence Snype to a term of life imprisonment pursuant to 18 U.S.C. § 3559(c)(1), also known as the "three strikes" law. *See Id.* at Dkt. No. 130, Ex. A at 15, 31. He did so, and the Second Circuit upheld Snype's conviction and sentence. *See United States v. Snype*, 441 F.3d 119 (2d Cir. 2006).

Earlier this year, Snype filed a motion pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), arguing, *inter alia*, that his mandatory life sentence was unjust. He also pointed to the fact that he was very young when he committed the offenses that counted as "strikes;" advised the court that his common-law wife was in need of care that he was uniquely able to provide; and cited both his difficult conditions of confinement during COVID and his impressive rehabilitation (a factor that cannot in and of itself justify compassionate release but that can be considered along with other factors). *See Snype*, Dkt. No. 151 at 14.[8] Taking all of this together, Judge Chin concluded that Snype had demonstrated extraordinary and compelling reasons sufficient to permit a reduction of the mandatory life sentence.

Judge Chin is only the most recent judge to have reduced an unduly harsh mandatory minimum sentence on a compassionate release motion. *See, e.g., United States v. Ramsay*, 2021

---

[8] *See also* Vargas, 2020 WL 6886646, at *1 (finding that, in combination, the defendant's rehabilitation, harsh sentence, medical issues, the pandemic, and intention to care for his mother were extraordinary and compelling reasons).

US Dist. LEXIS 89741 (SDNY 2021) (mandatory minimum life sentence reduced to 30 years –

time served); *United States v. Cabrera*, 2021 US Dist. LEXIS 63713 (SDNY 2021) (20 year

mandatory minimum reduced to time served); *United States v. Ramos*, 2020 US Dist. LEXIS

227906 (SDNY 2020) (10 year mandatory minimum reduced to time served); *United States v.*

*Baez*, 2020 US Dist. LEXIS 210169 (SDNY 2020) (10 year mandatory minimum reduced to time

served, even though the defendant had only served a small fraction of that sentence); *United States*

*v. Tazewell*, 2021 US Dist. LEXIS 99 (SDNY 2021) (20 year mandatory minimum reduced to time

served); *United States v. Kwok-Ching Yu*, 2020 US Dist. LEXIS 220458 (SDNY 2020) (mandatory

minimum life sentence reduced to 30 years – time served); *United States v Lewis*, 2021 US Dist.

LEXIS 1662 (SDNY 2021) (5 year mandatory minimum reduced to time served.).

I conclude both that my hands are not tied by the fact that the sentence imposed was a

mandatory minimum, and that I am not precluded from considering the manipulative way in

which the 25-year sentence was engineered. That being so, whether the sentences imposed on the

moving defendants qualify as "extraordinary and compelling" circumstances warranting relief is

essentially a question that answers itself.

Nothing could be more certain than the fact that the moving defendants would not have,

and could not have, devised on their own a crime involving missiles that would have warranted

the sentence the court was forced to impose. *See United States v. Cromitie*, 727 F.3d 194, 230 (2d

Cir. 2013) (Jacobs, C.J., concurring in part and dissenting in part) ("It is clear that Cromitie in his

unmolested state of grievance would (for all the evidence shows, and as the district court found)

have continued to stew in his rage and ignorance indefinitely, and had no formed design about

what to do. The government agent supplied a design and gave it form, so that the agent rather than

the defendant inspired the crime, provoked it, planned it, financed it, equipped it, and furnished

14

the time and targets. He had to, because Cromitie was comically incompetent, possibly the last candidate one would pick as the agent of a conspiracy."). Had the Government not contrived its elaborate sting operation, it is highly likely that the defendants would have lived out their lives in Newburgh -- quite possibly doing "life on the installment plan" as they cycled in and out of jail for a string of petty offenses, but never committing a crime remotely like what they became involved in in April and May of 2008. My misgivings about how the Government ensnared and then arranged things so that these men could be charged with crimes that carried a 25 year mandatory minimum factored significantly in my decision not to sentence them to more than the mandatory minimum (their guideline, predictably, was life). I was fully aware, at the time the sentence was imposed, that it did not accord with the so-called "parsimony clause" in 18 U.S.C. § 3553(a); as noted above, I as much as said so.

The fact that the Government appears to have recognized (if only *sub silentio*) the questionable nature of some of its actions in connection with this sting also counsels in favor of granting the motion.

In the Illinois stash-house cases, courts faced with compassionate release motions factored in changes the Government made, in response to judicial criticism, to the way it conducted and charged individuals in stash-house stings. *See, United States v. White*, 2021 WL 3418854, at *4 (granting release because "of the Government's changed policies surrounding stash house raid cases"); *Conley*, 2021 WL 825669 at *3-4 (granting release and highlighting "inherent unfairness and injustice" of stash house prosecutions); *United States v. Blitch*, No. 06 CR 586-2, Dkt. no. 666 (N.D. Ill. Apr. 13, 2022) (Leinenweber, J.) (granting release in part because "the Government no longer charges individuals for intent to distribute fictitious cocaine and the practice has been disavowed"). *United States v. Logan*, 2023 U.S. Dist. LEXIS 58636, *15-16 (noting that the

Government had disavowed its behavior stash-house stings). A similar change took place after the convictions were secured in this case, as the Government changed the way in which it deployed and handled its confidential informants in terrorism case – a fact this court recognized at the time of sentencing:

> I expressed in writing my views about the government's behavior here. If what I read in the newspapers about other cases be true, we have seen that law enforcement has changed in some very important aspects in the manner in which it handles investigations of this sort. That, it seems to me, is a welcome development. It may be that some good will come out of this case after all.

Sentencing Transcript, 09-cr-558, Docket No.206, at 57-58). The fact that no subsequent terrorism case in this district has been handled in remotely the same manner as this one speaks volumes; in fact, as far as I can tell, the Government has not conducted an operation of this sort at any point since the trial of this case ended.

Finally, I note that the United States Sentencing Commission has finally proposed amendments to USSG 1B1.13 dealing with the First Step Act. Those amendments cannot go into effect until November 1, 2023 at the earliest, so they have no governing force here. But nothing in those proposed amendments would appear to preclude the Court from considering the circumstances that resulted in the imposition of Defendants' unjustly harsh sentences as an extraordinary and compelling circumstance.

The proposed amendment both revises the "Other Reasons" category for granting compassionate release and adds an "Unusually Long Sentence" category in Application Note 1(D). The proposed amendments state:

> "(5) OTHER REASONS. – The defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4) are similar in gravity to those described in paragraphs (1) through (4)."

"(6) UNUSUALLY LONG SENTENCES – If a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law (other than an amendment to the *Guidelines Manual* that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances.

https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf at Page 13. Aspects of these proposed amendments bolster Defendants' argument.

This case admittedly does not fall within the UNUSUALLY LONG SENTENCES section of the proposed guideline, because the underlying statutes or guidelines applicable to these defendants and their crimes of conviction have not changed, such that a defendant convicted now of the same crime would face a shorter sentence.[9] There is, in short, no "new law" pursuant to which today's defendants are being sentenced more leniently for the same offense. But the revised guideline does recognize that a defendant whose sentence is "unusually long" can merit First Step Act relief if the defendant has served at least ten years of that sentence; here the defendants have served well over 14 years.

Of greater significance, the "OTHER REASONS" section of the proposed amendment is very broad, stating that *any other reason* of "*similar" gravity* to the reasons listed qualifies for a sentence reduction. In my opinion, the "disreputable" (to quote Judge Posner) conduct of the Government in this case is a "reason of similar gravity" to the types of things long considered on such motions – medical and family conditions, for example. In fact, it is far graver. The "unusually

---

[9] An example of what the Commission was targeting with this section is the significant reduction in the so-called "crack-powdered cocaine" disparity in the guidelines, which, from and after 2010, had guidelines at a relative rate of 18:1 rather than 100:1. *See* Fair Sentencing Act of 2010, Pub. L. No. 111–220, 124 Stat. 2372 ("FSA").

17

long," sentences imposed in this case were entirely the product of government manipulation. Nothing actually done, or even dreamed up, by the defendants warranted a sentence of such length. And while there has been as a technical matter no "change in law," there has been a change in the way the Government conducts these sorts of investigations -- much like the policy changes that flowed from the stash-house cases discussed in *Logan*, *Conley* and *White*. *See supra*, at 21. Finally, the defendants have served nearly 15 years— 60% of the 25-year sentence engineered by the Government as part of its sting operation.

The Court thus concludes that, in the unique circumstances of this case, the mandatory minimum 25 year sentence imposed on the moving defendants was both overly long and manifestly unjust, and so constitutes an extraordinary and compelling reason for this Court to consider reducing defendants' sentences, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). That is true whether considered by itself or in a "total mix" of factors, specifically those identified below.

2.  *Each Moving Defendant Has Identified Other Reasons to Support Consideration of His Request for Compassionate Release*

In addition to the argument about overly harsh sentences, which all three defendants make, each Defendant suggests in his motion various reasons specific to him that he believes are sufficiently extraordinary and compelling to warrant release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). They urge that, even if no single one of these reasons counsels in favor of release, taken together and in light of the length of their original sentence and the amount of time they have served, the "extraordinary and compelling" standard for compassionate release is met.

I conclude that each of the three defendants has identified factors independent of his overly long sentence that, taken together with the contrived overly long sentence, can and should be considered "extraordinary and compelling" for purposes of his motion for compassionate release.

18

**Laguerre Payen**

Payen contends that his severe mental illness, his risk of contracting and suffering from COVID-19, and the conditions of his confinement during the pandemic, including disruption to programming and visitation, are additional reasons that, when considered cumulatively, warrant granting his release. Payen Brief, ECF No. 251 at 13-23.

*Mental Health Issues*

Payen has a long history of mental health issues. He was found to be developmentally disabled during his school-age years and began abusing drugs at age 15. Payen Motion, Exh. B at 25. During a stint in New York State prison from 2002-2005 for attempted assault, he required psychiatric hospitalization on at least two occasions, and was diagnosed with schizophrenia and reported having auditory hallucinations. *Id.* at 2. When Payen (who is not a U.S. citizen) completed his state sentence, he was transferred to Immigration Customs Enforcement (ICE) custody for possible deportation to Haiti. While in ICE custody he engaged in extreme psychotic behavior and was admitted to a custodial psychiatric facility in South Carolina. *Id.* In October 2008, Payen was released after ICE determined that he was protected under the Convention Against Torture because he would not be able to get the psychiatric medications he needed in Haiti. *Id.* Less than six months later, Payen was recruited as a lookout for the Government's faux terrorist operation.

In June 2011, prior to sentencing in this case, the Court ordered a psychiatric evaluation "to determine [the defendant's] present state of mental health and his ability to proceed to sentencing." ECF No. 178. Payen was ultimately found fit to proceed (that bar is not high). However, the Court specifically recommended in its judgment that the BOP "give defendant a serious mental health evaluation before making a decision on designation." (ECF No. 204). Mental

19

health treatment was also a condition of supervised release. *See* Payen Judgment, 09-cr-558 (CM),

Dkt. No. 204.

Not surprisingly, Payen's mental health issues worsened during his incarceration.

According to a 2019 BOP Psychological Services Report prepared at Allenwood Penitentiary:

> Mr. Payen has been seen by psychology services at various institutions since the beginning of his incarceration. He has been diagnosed in the BOP with the following: Schizophrenia, unspecified psychosis, unspecified anxiety disorder, anxiety state (unspecified), depressive disorder, unspecified episodic mood disorder, malingering, borderline intellectual functioning, mild intellectual disability (intellectual developmental disorder), moderate mental retardation, and antisocial personality disorder. His report of symptoms has at times been described as inconsistent and incongruent with his behavioral presentation. He has endorsed auditory, visual, and tactile hallucinations; multiple personalities; and depression. Additionally, he has a documented history of faking seizures. He has undergone 18 suicide risk assessments within the BOP to date. The assumed motives for his repeated threats to engage in self-harm or low lethality self-injurious behavior have been to change the conditions of his confinement (e.g., avoid placement in segregation). Additionally, he has asserted that he cannot understand English, which has been considered a misrepresentation of his abilities (though a language barrier at times has been considered to be present). Often, he has presented as a behavioral management problem requiring multiple placements in suicide watch and restraints.  At various times during his incarceration he has been seen via telepsychiatry and prescribed antipsychotic medications, such as risperidone and olanzapine, as well as antidepressant medications, such as fluoxetine and citalopram.

Payen Exh. B at 2-3.

What stands out in Payen's BOP psychiatric history is that his mental health stabilizes when he is on his prescribed medications and deteriorates precipitously when he stops taking his medications.  For example, in 2016, his mental condition deteriorated so much that he was committed to a mental health facility. Def.'s Br. at 2.  After receiving medication and treatment, he improved, and the mental health commitment ended.  (*Id.*)  However, Payen subsequently stopped taking his medication—the recurring theme in his treatment—and decompensated, which resulted in his again being committed by court order in March 2018.  (*Id.*)

In 2019, Payen was transferred to the Transitional Care Unit at USP Allenwood, a unit specifically designed for inmates with serious mental illness. *Id.* The Allenwood psychiatric team diagnosed Payen with "Intellectual Development Disorder and Schizophrenia," and recommended that he be cared for in a residential mental health setting "where he can receive regularly scheduled treatment and medication management." Exh. B at 7. Since being designated to the TCU at Allenwood, Payen's condition has improved greatly.

Counsel argues that, "Payen's multiple mental disabilities made the prison environment, already extremely harsh for someone convicted of a crime like this, much worse, as he was placed in solitary confinement for long periods of time, and sometimes placed in four-point restraints to stop him from harming himself." Counsel suggests that "while he served about [14] years, to the extent that he has any concept of time, it must have seemed much longer to him."

I agree. People with severe mental illness often face unusual challenges in navigating life in prison. "Behaviors related to their symptoms can put them at risk for consequences of violating facility rules, such as solitary confinement or being barred from participating in programming. *See* https://www.nami.org/Advocacy/Policy-Priorities/Improving-Health/Mental-Health-Treatment-While-Incarcerated. Since entering the custody of the BOP in 2009, Payen has been cited for over 150 incident code violations. Exh. B at 2. "The incidents range in severity from refusing to obey and order to possessing a dangerous weapon . . ., and a significant portion of these violations involved assault or threatening bodily harm." *Id.* "He was determined to be not competent and not responsible due to mental illness for approximately 16 of these violations." Id.

It would be naive to attribute Payen's substantial history of rule breaking while in BOP custody solely to his mental health issues. BOP mental health professionals have suggested that Payen was on occasion guilty of malingering— feigning psychiatric symptoms in an effort to

21

manipulate BOP staff. *See* Exh. B. He did the same at trial. *See* Trial Transcript from September 13, 14 and 15, 2010. That said, Payen's mental health issues are real and profound and have made his time in BOP custody more difficult than that of the average prisoner.

*COVID-19*

Payen argues that COVID-19 Pandemic is an additional reason to grant him compassionate release.

Much has changed since Payen filed his motion during last year's Omicron surge. Today, COVID-19 is far from the dreaded killer that arrived on our shores in 2020. On May 11, 2023, the Center for Disease Control declared the COVID-19 public health emergency ended. The CDC has now shifted from an emergency response posture "to incorporating COVID-19 activities into sustainable public health practice." *End of the Federal COVID-19 Public Health Emergency (PHE) Declaration*, https://www.cdc.gov/coronavirus/2019-ncov/your-health/end-of-phe.html. The incidence of COVID-19 infections throughout the Bureau of Prisons has dropped significantly; BOP is currently reporting zero cases at the Allenwood Penitentiary. *BOP COVID-19 Statistics*, https://www.bop.gov/ coronavirus/covid19_statistics.html.

So even if Payen had an underlying health condition that would place him at an increased risk of severe illness (his BOP medical records actually indicate that he is in relatively good health), COVID-19 Pandemic does not presently constitute an extraordinary and compelling circumstance warranting his early release.

However, what is true on a going forward basis is not necessarily true when looking back. The pandemic was extremely hard on prisoners. The necessary steps that the BOP has taken to stop the spread of the deadly virus—lockdowns, suspension of programs, and curtailed visitation— led to increased prisoner isolation, fewer program opportunities for inmates, and significantly for

22

Payen, limited opportunity to attend group therapy. This created harsher than usual conditions of confinement, which is a factor the court can and does consider in deciding whether extraordinary and compelling circumstances warrant granting his motion.

**David Williams**

David Williams asserts that the strides he has made at personal rehabilitation, the danger of contracting COVID-19 in prison are two more extraordinary and compelling reasons for the Court to reduce his sentence.

*Rehabilitation While Incarcerated*

David Williams argues that "he has been rehabilitated and there is no danger to society if he is released," citing *inter alia* his institutional record, a letter he wrote to the Court, and various letters of support from friends, family, and members of the public. (DW Br. at 4-15).

The Court accepts, that David Williams appears to have made strides at rehabilitating his life. I say that, even though his prison records also show that he was disciplined seven times during his 14 years of incarceration, most recently in 2022, when he was docketed 27 days of good time credit for fighting with another inmate. I do not make light of these transgressions, and unlike Payen, Williams' misbehavior cannot be explained by mental illness.

But his prison records also show that Williams has earned his GED and successfully completed numerous educational courses. Testimonials from various friends and family members also corroborate the notion that Williams has become a different and better person while in prison. He has even become a better father—a difficult task from behind prison walls. His family is extremely supportive, and he has lined up places to live and to work if he is released.

Rehabilitation alone cannot qualify as an extraordinary and compelling reason to grant a defendant's motion for compassionate release. *United States v. Brooker*, 976 F.3d 228, 237–38 (2d

Cir. 2020) (quoting 28 U.S.C. § 994(t)). However, a defendant's effort at rehabilitation tends to tip the scales in his favor when aggregated with other more compelling grounds—such as, in this case, the unduly harsh and unjust sentence.

*COVID-19*

David Williams argues that he is at heightened risk from COVID-19 because he suffers from hypertension and "unspecified abnormalities of breathing." (DW Br. at 20). While the CDC has stated that there is "[m]ixed evidence" that hypertension makes an individual more likely to get severely ill from COVID-19 (*see* CDC, *COVID-19 Underlying Medical Conditions*, June 15, 2022, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-care/underlyingconditions.html), the current low incidence of COVID-19 infection and the treatment options for those who do become infected, has eliminated COVID-19 as a basis for granting compassionate release—even for those persons whom the CDC has in the past said were at risk of suffering a severe outcome if they were to become infected.

However, as noted above, the harsh conditions of confinement that defendants were forced to endure during the years of the pandemic must be part of the "extraordinary and compelling circumstances" analysis.

**Onta Williams**

Onta Williams' moving papers are principally devoted to the types of arguments that the court is not permitted to consider – entrapment, for example, and selective prosecution – because they are attacks on his conviction. However, the record demonstrates that he, too, is well on the way to rehabilitation.

BOP records show that—aside from two fighting incidents (resulting in no injuries) in 2015—Williams has been a model inmate during his incarceration. He has taken educational and self-improvement courses while serving his sentence (Williams earned his GED during an earlier

term of imprisonment).  He has an admirable record of jailhouse employment; he currently serves as the head cook at his institution, a job in which he takes great pride. *See* Onta Williams Motion, 09 cr 558 (CM), Dkt No. 258-2, Exhibits C and D.

Onta Williams also continues to express remorse for his participation in this case.  In a letter to the Court that was appended as an exhibit to his compassionate release motion (Exhibit C), Williams apologizes to the Riverdale Jewish community and to the United States Government. He writes thoughtfully about how much the case has cost him, but also how much he has grown as a person. "Though I have lost a lot, family, friends, and years (I can't go back), I have also gained a lot, as for the betterment of self.  Not only for me but for my family and others. For me to say 'I got it' would be lie because I feel I have so much more to learn. What I have learned is that I am not at all the same person I was then." ECF 258-2 at 7-8.

Williams' expressions of remorse, read in conjunction with his favorable prison record, suggest a man well along the road to rehabilitation. And while, as stated above, rehabilitation alone cannot form the basis for granting release or a reduction of sentence under 18 U.S.C. § 3582(c)(1)(A)(i), it can bolster arguments for a finding of extraordinary and compelling circumstances made on other grounds—in this case, an unduly long sentence coupled with the harsh conditions of confinement that all three moving defendants suffered from during the pandemic.

*3.    The Section 3553(a) factors do not counsel against granting the defendants' motions*

The fact that each defendant has pointed to extraordinary and compelling reasons why he could qualify for compassionate release is not enough. The court must also be satisfied that the sentencing factors set forth at 18 U.S.C. § 3553(a)—that the sentence reflect the nature and circumstances of the offense, the defendant's personal characteristics, the need to provide specific

25

and general deterrence, and to promote respect for the law—are consistent with the contemplated reduction.

They are – far more than they were at the time of the original sentencing.

Because of the mandatory minimum, the 3553(a) factors were virtually irrelevant when the moving defendants were originally sentenced. The court concluded long ago, and announced at the time of sentencing, that the sentences being imposed solely as a result of governmental contrivance exceeded anything required by the parsimony clause. As heinous as defendants' agreement to participate in what the FBI and Hussain had cooked up was – and make no mistake, it was heinous— the sentence was the product of a fictitious plot to do things that these men had never remotely contemplated, and that were never going to happen. Unlike Cromitie, who recruited them, Payen and Onta Williams were never recorded making anti-Semitic or anti-Government statements; their role in the "conspiracy" was limited, both in time and in planning, and their actual behavior was not even theoretically dangerous, let alone violent. David Williams did join in Cromitie's hateful rhetoric on a handful of occasions, but there is no evidence that he harbored any anti-Semitism prior to having to convince Hussain that he would commit "jihad." In fact, the moving defendants had to be coaxed into saying that were participating in the mission "for Allah." *See* Trial Exhibit GX-125A-e5-T; *United States v. Cromitie*, No. 09 CR. 558 CM, 2011 WL 1842219, at *23 (S.D.N.Y. May 10, 2011), aff'd, 727 F.3d 194 (2d Cir. 2013).

The 14-plus years that the moving defendants have already served for starring in the Government's made for TV movie of May 20, 2008, is at the upper end of what the court would have imposed if it had been free to fashion a sentence that accurately reflected the nature and circumstance of the offense and the history and characteristics of the impoverished and susceptible criminals who committed it. A decade and a half in prison, the last few years under conditions

26

harsher than anything imagined by the court at the time of sentencing, is more than sufficient to provide deterrence and promote respect for the law. As far as this court is concerned, the only thing connected to this case that undermined anyone's respect for the law was the Government's questionable decision to send a villain like Hussein to troll among the poorest and weakest of men for "terrorists" who might prove susceptible to an offer of much-needed cash in exchange for committing a faux crime.

Turning to the other 3553(a) factors: Continued imprisonment is not needed in order to provide the Williamses with rehabilitation; bothof them have demonstrated rehabilitation and remorse for their crimes. Nor is continued imprisonment the best way to obtain the mental health care that Payen so desperately needs— mental health care that is and will continue to be a condition of his post-incarceration supervised release. Payen's attorney has already begun looking for supportive housing in the Newburgh vicinity, and Probation needs to be involved in arranging for Payen to be placed in a facility that can deal with his issues.

In sum, the 3553(a) factors, far from being an impediment to granting the defendants' motions, counsel strongly in favor of granting them.

So the defendants' motions for a sentence reduction are GRANTED.  The moving defendants' sentences are reduced to time served plus 90 days. The court will notify Probation immediately, because it will be necessary to accelerate the preparation of release plans for these long-incarcerated men. Payen in particular should not be released from custody without being immediately transferred to some sort of supportive housing in order to deal with his mental health issues.

## CONCLUSION

The motions at Dkt. Nos. 251, 255 and 258 are GRANTED. The Clerk of Court is directed

to remove these motions from the court's list of open motions.

This is a written opinion.

Dated: New York, New York
      July 27, 2023

Colleen McMahon
United States District Court Judge

BY ECF TO ALL COUNSEL

28